Wm. H. HARDING et al., Plaintiffs,

v.

A. A. CAMERON, Defendant.

Civ. No. 8876.

United States District Court
W. D. Oklahoma.

Aug. 30, 1963.

W. E. Robertson, Robinson, Robertson & Barnes, Oklahoma City, Okl., for plaintiffs.

Solon W. Smith and Hal Leaming, Smith, Leaming & Swan, Oklahoma City, Okl., for defendant.

BOHANON, District Judge.

This diversity action was instituted in the District Court of Oklahoma County, State of Oklahoma, on the 24th day of May, 1960, by the plaintiffs, Wm. H. Harding, and fourteen other named plaintiffs, against A. A. Cameron, seeking an accounting from the defendant for gas produced from certain oil and gas leases in Grady County, Oklahoma. The case was properly removed to this Court because of diversity of citizenship between all of the plaintiffs and the defendant and the amount in controversy being in excess of $10,000, exclusive of interest and costs. The plaintiffs brought this action for themselves and all others similarly situated, under the provisions of Section 233, Title 12, Oklahoma Statutes.[1]

Plaintiffs, as lessors, are the owners of interests in the oil, gas and other minerals produced from the lands hereinafter described. The defendant A. A. Cameron, as lessee, under oil and gas leases from the plaintiffs, is the owner of certain mineral interests under these lands.[2] The defendant is the operator of the producing oil and gas wells under consideration. All of the oil and gas leases involved contain substantially identical clauses as to royalties on gas, and provide for royalties to lessors on gas of ⅛th of the value of the gas at the mouth of the well, or ⅛th of the proceeds at the mouth of the well, at the prevailing market rate.

The first producing well was the Crawford No. 1, completed in October 1955, producing oil and small quantities of casinghead gas. The first well to produce gas in commercial quantities was the Fritts No. 1 well, completed in May 1957. Beginning in August 1957, the high pressure gas from the Fritts No. 1 well was sold to Consolidated Gas Utilities Corporation (now Arkansas Louisiana Gas Company), which will be hereinafter referred to as Arkla, through a wellhead connection to Arkla's pipeline at 11 cents per MCF. High pressure gas which was produced from wells later completed was sold to Arkla through direct wellhead connections on the same basis. Casinghead gas, and gas of insufficient pressure to enter Arkla's pipeline, was vented or flared until defendant constructed its compressor station and placed it in operation.

The defendant began construction of a compressor plant in June 1958, to boost the pressure of the low pressure gas and casinghead gas so that it would enter the pipeline connection of Arkla. Compression operations with one compressor began in September 1958. A second com-

---

1. "When the question is one of common or general interest of many persons, or when the parties are very numerous, and it may be impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

2. TRACT NO. 1: S/2 of SE/4 of Section 31.
TRACT NO. 2: N/2 of SW/4 of Section 31.
TRACT NO. 3: Lots 3 and 4 and NE/4 of SW/4 of Section 31.
TRACT NO. 5: SW/4 of Section 32.
All in Township 3 North, Range 8 West.

pressor was installed and began operations in November 1958. The first gas from the Crawford Lease was run through the compressor in September 1958, and the gas from the other leases began in November 1958. The cost of this compressor plant to the defendant was $175,019.55. As of March 31, 1963, approximately 4.81 billion cubic feet of gas had been compressed and marketed to the pipeline company. The connection to the pipeline company's line is located on the Crawford Lease, immediately behind the building in which the compressors are housed and at a convenient point to take gas from all the properties. The processed gas through this compressor station was sold to the pipeline company for 11 cents per MCF for the period beginning with first compression (September 1958) until July 31, 1961. During this period plaintiffs' royalties from this gas were calculated on the basis of 4.375 cents per MCF. Beginning August 1, 1961, the price paid by the purchaser has been 15 cents per MCF, and plaintiffs' royalties were then computed on the gas on the basis of 6.375 cents per MCF. Arkla increased its price for gas 4 cents per MCF, and plaintiffs were credited with 2 cents per MCF.

When the gas, including plaintiffs' gas, from the Crawford Lease began in September 1958, and the gas from the remaining wells beginning in November 1958, was put through this compressor plant, there were no contracts for the sale of such gas, and therefore no prevailing market rate or price for low pressure and casinghead gas in the area of the wells herein involved. Defendant's royalty owners, plaintiffs here, had no notice or knowledge of this operation.

After the original petition or complaint was filed, other parties, namely Humble Oil and Refining Company, Woods Petroleum Corporation, and Peak Petroleum Company, were made additional parties defendant. These additional defendants owned a part of the leases covering a part of the lands involved. By later stipulation these parties were dismissed from the case, leaving the controversy solely between plaintiffs, as defendant's lessors, and the lessee, A. A. Cameron.

Plaintiffs contend that they are entitled to the value or prevailing market rate for gas produced from the wells at the rate and price received therefor by the defendant from the pipeline company, and that the defendant has accounted or purported to account to plaintiffs at far less than the value or the market rate for the gas. The defendant Cameron by Answer admits the following ownership of leasehold estates, to-wit:

TRACT NO. 1 (Crawford Lease)   Full leasehold interest

TRACT NO. 2 (Burris Lease) and
TRACT NO. 3 (Fritts Lease)   80.793% of the leasehold interest

TRACT NO. 5 (Thompson Lease)   63.888% of the leasehold interest.

---

Defendant asserts as a defense that he contracted for the sale of casinghead gas, by written contracts entered into in good faith, which created prima facie evidence of the fair market value of plaintiffs' gas and has accounted on this basis; further, that on March 1, 1960, defendant wrote and mailed letters to all of the plaintiffs explaining the basis of compression charge and the market value of the gas produced. This letter from defendant's attorneys was the first actual knowledge or notice which plaintiffs had of defendant's method of accounting to them. Defendant contends that thereafter plaintiffs accepted, and continue to accept, royalty payments on this basis, and that they are therefore estopped to deny the correctness and sufficiency of such payments; that by reason of this

letter and the acceptance of payments, a mutual interpretation and construction of defendant's obligations was reached and this interpretation and construction is binding upon the plaintiffs. The defendant further contends that there is a defect of parties in that this action cannot be maintained by the plaintiffs for the benefit of other royalty owners not named parties to the action.

With respect to defendant's contention that it made written contracts with other working interest owners, to-wit: Humble and Woods, thus establishing a fair market value for plaintiffs' casinghead gas, the background leading up to these contracts should be examined. Mr. J. A. Lyon, General Superintendent for A. A. Cameron, testified for the defendant in substance that prior to the construction of the compressor plant by the defendant an attempt was made to interest Skelly and Lone Star Gas Company and were advised by these companies that they were not interested in constructing a compressor plant and purchasing gas from the wells involved. He further testified that in early 1958, after an engineering survey had been workedup, the non-operators, Carter (Humble), et al. were consulted regarding the construction of a compressor plant and were furnished estimated cost figures and were given an opportunity to participate in the cost of the plant and that these non-operating lease owners declined to so participate. Thereafter defendant decided to and did construct the compressor plant.

Thereafter defendant and the non-operators, Humble and Woods, began negotiating for a gas purchase contract for the non-operators' gas. A casinghead gas contract was entered into between the Carter Oil Company (now Humble), as seller, and A. A. Cameron, as buyer. This contract is very lengthy and provides for the method of accounting and other provisions between the contracting parties. This casinghead contract is dated May 1, 1959, eight months after defendant had begun the appropriation of plaintiffs' gas, and without their knowledge. However, the contract was not actually entered into between the parties until August 8, 1959, eleven months after plant operations began. The stipulation of the parties filed in this Court May 24, 1963, provided that Exhibit "A" [3] be received in evidence.

It was also stipulated that a contract identical with the Humble-Cameron Oil and Gas Purchase Contract, with the exception of the date and names, was entered into between defendant and Woods Petroleum Company, and that an identical letter was executed between the defendant and Woods Petroleum Company, accepted by Woods on July 27, 1959. So under the admitted facts the Gas Purchase Contract between Carter and

---

3.         "May 1, 1959
"Mr. A. A. Cameron
"1100 Petroleum Club Bldg.
"Oklahoma City 2, Oklahoma
"Dear Sir:
"We have executed and are returning herewith for your consideration two revised copies of the proposed casinghead gas contract between Carter, as Seller, and Cameron, as Buyer, covering certain gas attributable to Carter's interest in gas produced from the South 30 Acres of Lot 2 and the S/2 N/2 SE/4 NW/4 and S/2 SE/4 NW/4 Section 31–3N–8W, Grady County, Oklahoma.
"The execution of said contract is, however, subject to the following conditions:
"(1) The effective date of said contract shall be retroactive to the date of first delivery of gas to Buyer for Seller's account.

"(2) Paragraph (a) under Definitions shall be amended to the extent that none of Seller's gas-well gas will be compressed for delivery into the residue purchaser's lines without the prior consent of Seller.
"If the foregoing meets with your approval, please so indicate by signing in the space provided below and returning one copy of this letter for our files.
"Yours very truly,
"THE CARTER OIL COMPANY
"By        Thomas Brownfield /s/
        Vice President
"ACCEPTED AND AGREED TO this 8th day of August, 1959.
"A. A. Cameron /s/
"A. A. Cameron"

Cameron was actually entered into on the 8th of August, 1959, and the Gas Purchase Contract between defendant and Woods was actually entered into on July 27, 1959, while delivery of plaintiffs' gas from the Crawford Lease began in September 1958, and from the remaining leases in November 1958, at which time it must be admitted, and the Court so finds, that there was no prevailing market price at the wellhead in the area involved for low pressure gas or low pressure casinghead gas. It is true that the letter amendments to the Gas Purchase Contracts with Humble and Woods provided the agreements would become effective and retroactive to the date of first delivery of low pressure gas to Cameron. This retroactive provision of the contracts was merely for the purpose of fixing the accounting period from the date of first delivery of gas and not the actual date when the minds of the parties finally met and the contracts were consummated, on August 8, 1959 with Humble, and July 27, 1959 with Woods. The Court finds and concludes that when defendant first began appropriating plaintiffs' low pressure gas in September 1958 there was no market, or prevailing market price for this gas, and that the subsequent contracts between defendant and Humble and Woods did not create or establish a market price, or prevailing market price or value for this gas. Defendant, in connection with these contracts, urges that they were entered into at arms length between the parties. The record clearly shows that there was no free or competitive market for this low pressure gas. Humble and Woods had a legal duty, the same as defendant owed to plaintiffs, to market their lessor's gas, and under the circumstances revealed by this record Humble and Woods were at the mercy of the defendant. They could sell their low pressure gas to the defendant or not sell at all. Furthermore the defendant was the operator of the leases, and there was no practical way to separate or mar-

ket the Humble and Woods gas, without marketing the defendant's gas at the same time and place. In such a case there is no free market at the well. See Hemler v. Union Producing Company, D.C., 40 F.Supp. 824, at pp. 832–834. When defendant began appropriating plaintiffs' low pressure gas and there was no prevailing market price at the wellhead, as is the case here, the value of plaintiffs' gas became established by law. The record shows that defendant began taking plaintiffs' low pressure gas and selling it to the pipeline purchaser for 11 cents in September 1958. Then defendant, by shopping around for approximately one year, entered into the contracts with Humble and Woods, who were at a disadvantage under the circumstances, as above outlined, and are now seeking to relate these contracts, of which plaintiffs had no knowledge prior to March 1, 1960, back to the first taking of this low pressure gas, and thus by such relation back fix a wellhead price, when in fact none existed. These contracts are not binding on these plaintiffs, so as to change the legal method or formula for accounting and payment to these plaintiffs which came into being by operation of sound, legal principles binding upon the defendant when it first began appropriating plaintiffs' low pressure gas in September 1958.

■ An implied duty or obligation was imposed by law upon the defendant to exercise the diligence of a prudent operator, and lessee, having due regard for the interests of both lessor and lessee, to obtain a market for the gas at the best price obtainable.[4]

The course taken by the defendant, as revealed by this record, was primarily in his own interest and without regard to his obligations to these plaintiffs.

■ In taking and appropriating plaintiffs' low pressure gas, the defendant acted in a dual capacity, as both buyer and seller, and in compliance with its.

4. Gazin, et al. v. Pan American Petroleum Corp., et al. (Okl.), 367 P.2d 1010; Townsend, et al. v. Creekmore-Rooney Company, et al. (Okl.), 358 P.2d 1103; Summers, Oil and Gas, Vol. 2, Sections 410, 415 (Permanent Edition).

·duties and obligations as a diligent and prudent operator having regard for the interests of both parties, should not be permitted to so deal and thus make a profit, if an accounting shows a profit was made.

In Young, et al. v. West Edmond Hunton Lime Unit (Okl.), 275 P.2d 304 at page 309, the Court said:

"It therefore prohibits a party from purchasing on his own account that which his *duty* or trust required him to sell on account of another, and from purchasing on account of another that which he sells on his own account. In effect, he is not allowed to unite the two opposite characters of buyer and seller, because his interests, when he is the seller or buyer on his own account, are directly conflicting with those of the person on whose account he buys or sells." (Emphasis supplied.)

■ The rule in Oklahoma fixing the "value," or "market price," of gas at the wellhead and processed by lessee through a compressor plant constructed by it is the gross price which the lessee receives from the purchaser less the actual cost of compression and reasonable depreciation on its compressor plant.[5]

■■ Defendant did not seek by its Answer to offset against the price he received from the sale of plaintiffs' gas to the pipeline company, the cost of compression, or depreciation on its plant. By letter[6] dated March 1, 1960, and

5. Katschor, et al. v. Eason Oil Company, et al., 178 Okl. 634, 63 P.2d 977; Cimarron Utilities Company v. Safranko, 187 Okl. 86, 101 P.2d 258; Molter, et al. v. Lewis, et al., 156 Kan. 544, 134 P.2d 404; Matzen, et al. v. Hugoton Production Company, 182 Kan. 456, 321 P.2d 576; Phillips Petroleum Company v. Johnson (5 Cir.), 155 F.2d 185; Hemler v. Union Producing Company (D.C.West.Dist.La.), 40 F.Supp. 824.

6. "March 1, 1960
"Re: Sections 4, 5 and 6, 2N, 8W; Section 31, 3N, 8W; and Section 36, 3N, 9W. Marlow Area, Oklahoma
"To the Royalty Owners in the subject area:
"For a number of years our client, Cameron Oil Company, has operated some of the leases in the above area. Our records indicate that you are one of the royalty owners in this area entitled to participate in the production of oil and gas.
"Production of oil and dry gas has always been marketed by the various operators in this field, but the casinghead gas produced was unmarketable in that it required compression before it could be put into a purchaser's lines. To build the necessary compression plant at great expense is not required by law of the operators of leases, and this product was for several years entirely wasted. In 1958, Cameron Oil Company, at an original expense of almost $200,000.00, built a compression plant and has since provided maintenance and operation of it.
"The other two operators in the field, The Carter Oil Company and Woods Petroleum Company then negotiated with Cameron to process the casinghead gas produced from their leases. The negotiated price allowed Cameron 50 per cent of the value of dry gas produced from the plant, plus a compression charge of 2.25 cents per 1,000 cubic feet, to provide a reasonable return on Cameron's investment and to defray the cost of operation and maintenance of the plant. Cameron was also allowed for these purposes 75 per cent of the value of liquid products derived from the compression process. These figures were arrived at by arms-length negotiation with experienced operators, who actually have a seven times greater stake in the returns than the royalty owners under their leases.
"In addition to paying Carter and Woods for their share, Cameron has the duty to pay royalty owners under its leases and those of Carter and Woods for the royalty on the casinghead gas. Cameron has made, and will continue to make, payment to royalty owners on the same basis as Carter and Woods are paid. This basis conforms to the law as laid down in Hopkins vs. Texas Company [10 Cir.], 62 F.2d 691 (Okl.) and Katschor vs. Eason Oil Company, ([178] Okl. [634]) 63 P.2d 977, and other cases involving similar situations.
"The Royalty proceeds of casinghead gas produced from the plant have been paid periodically to the royalty owners by Cameron, as indicated by the checks you have already received. The liquid products are smaller in value, hence accumulated runs will be paid to royalty owners periodically. Checks will be mailed monthly, unless the amounts due are less

admitted in evidence, defendant fixes its compression charge or cost at 2.25 cents per MCF. Plaintiffs, at pretrial December 26, 1961, and at trial, agreed that this charge was reasonable and acceptable to them. It is not clear from this letter exactly what this 2.25 cents covers, nor did the defendant offer evidence showing what the charge included. The defendant offered no evidence of plant depreciation, unless it be assumed that plant depreciation is included in the charge of 2.25 cents per MCF of gas. The burden of proof was upon the defendant to show its cost of preparing this low pressure gas for sale to the pipeline purchaser. See Phillips Petroleum Company v. Johnson (5 Cir.), 155 F.2d 185, at page 195. Confronted with this state of the record, the Court finds and concludes that the defendant should account to the plaintiffs for their low pressure gas run through the compressor and sold by defendant to Arkla on the basis of the gross sales price less 2.25 cents per MCF of gas so processed and sold.

In connection with this accounting, the parties stipulated at pretrial, Paragraph 9 of the Order,[7] so it is not necessary for the Court to here determine the mineral interest ownership of each of the parties or the amount of gas produced from the tracts of leases involved, or the amount of money owed by the defendants, if any.

■ The Court is of the opinion that the defendant's contention that these plaintiffs are estopped to question the defendant's method of accounting to them is not tenable. It is to be noted that the

letter of March 1, 1960, advising plaintiffs of the method of accounting, was the first actual knowledge or notice plaintiffs had of the price which defendant proposed to pay to plaintiffs for their gas. This action was brought in the State Court May 24, 1960, only a short time after receipt of the letter of March 1, 1960, clearly evidencing that plaintiffs acted with due dispatch and diligence in rejecting the method of accounting outlined by the defendant, and asserting their claim for additional proceeds and accounting. One of the necessary ingredients of any form or type of estoppel is that the party asserting it must have, without knowledge of the facts, been induced to change his position to his prejudice. No such showing has been made in this case. The defendant, with full knowledge of all the facts, had already taken his position as to how he was going to account for gas more than a year before he brought the matter to the attention of plaintiffs, who were without knowledge of the facts. No action taken by the plaintiffs, if any, in 1960, could have influenced defendant to change his position, or the course of action which he had been pursuing since September 1958. Noble v. Johnson, 145 Okl. 46, 291 P. 26; Oklahoma City v. Pratt, et al., 185 Okl. 637, 95 P.2d 596; Continental Oil Co. v. Rapp, et al. (Okl.), 301 P.2d 198.

■ With respect to the defendant's claim that there is a defect of parties, the Court is of the opinion and so holds that this is a proper class action maintainable by the plaintiffs for themselves and all others similarly situated, under Title 12

---

than one dollar, in any event the balance to be disbursed annually.

"The foregoing is offered by way of explanation of the additional royalty checks you have received, and will be receiving. You may direct any inquiries you might have in this regard to the undersigned.

"Very truly yours,
"SMITH, LEAMING AND SWAN
"By: /s/ Hal D. Leaming
"HDL:lm"

7. "9. That upon the trial of this cause the Court need not determine the mineral interests owned by the plaintiffs or other

parties, the amount of gas produced from any of the tracts or leases here involved or the amount of money, if any, owed by the defendants, or any of them, to the plaintiffs, or any of them, and in the event it is determined that defendants, or any of them, should account to plaintiffs, or any of them, for any sum in addition to sums heretofore paid or tendered, the basis on which the accounting shall be made shall be determined by the Court and the calculations in connection therewith made by the parties, subject to review by the Court upon the complaint of any party dissatisfied therewith."

O.S. Section 233, and also under Rule 23, F.R.Civ.P., Barron and Holtzoff, Federal Practice and Procedure, Vol., 2, p. 149; Young v. West Edmond Hunton Lime Unit (Okl.), 275 P.2d 304.

Assuming, arguendo, that this is not a class action, the rights of the named plaintiffs, and duties of the defendant, are as set forth above.

The defendant is ordered to account to the plaintiffs for low pressure gas purchased by it and sold to the pipeline company on the basis outlined in this Opinion. Plaintiffs' attorneys will submit an appropriate decree within ten (10) days, serving a copy thereof on defendant's attorneys within five (5) days for approval. If not approved, the Court will prepare and enter an appropriate Judgment.