Milo M. CRAIG et al., Plaintiffs,

v.

CHAMPLIN PETROLEUM COMPANY, Defendant.

Civ. 67–197.

United States District Court
W. D. Oklahoma.

Feb. 12, 1969.

Special Findings and Order
May 21, 1969.

George Verity, of Brown, Verity & Brown, Oklahoma City, Okl., Harry C. Evans, Kingfisher, Okl., and C. D. Curtis, Fairview, Okl., for plaintiffs.

H. Carter Burdette, Fort Worth, Tex., E. S. Champlin, Enid, Okl., and T. Murray Robinson, Oklahoma City, Okl., for defendant.

## OPINION

BOHANON, District Judge.

This case basically involves alleged underpayment by the defendant to plaintiffs of gas royalties under leases executed by the plaintiffs to the defendant, as lessee under said leases for cancellation of the leases and an accounting for such underpayments.

The named plaintiffs bring this action as a class action for all persons similarly situated.

This action was originally instituted by plaintiffs in the District Court of Major County, Oklahoma, and was removed to this court by the defendant, Champlin Petroleum Company, on the ground of diversity of citizenship and the amount involved.

The defendant, Champlin Petroleum Company, is the sole owner and operator of the working interest under the oil and gas leases involved in this case. The lands involved are described in Exhibit "A" attached to plaintiffs' original Complaint filed in the State District Court and lie generally in Townships 22, 23 and 24 North, Ranges 9, 10 and 11 West, in Major and Alfalfa Counties, Oklahoma, commonly referred to as the Chaney Dell area.

## THE ISSUES

Plaintiffs contend, and the defendant denies, that this is a proper class action under Rule 23 of Federal Rules of Civil Procedure.

Plaintiffs contend, and defendant denies, that the express and implied covenants of the oil and gas leases involved in this case give rise to a duty on the part of the defendant to pay plaintiffs for their portion of the gas any sum in excess of that already paid by the defendant to the plaintiffs.

Plaintiffs contend, and defendant denies, that they are entitled to a higher price for their gas than has been or is being paid by the defendant, and they are entitled to an accounting and a declaratory judgment fixing their rights under the terms of the respective leases involved and the amount of their recovery, if any.

The defendant contends that plaintiffs have failed to state a claim upon which relief could be granted. Defendant also contends that primary jurisdiction to determine the subject matter of this action lies with the Federal Power Commission, and, therefore, this Court is without jurisdiction.

The defendant further says that it has exercised good faith and reasonable diligence in marketing the gas and that it has paid each plaintiff in full for royalties due under the terms of such leases; and further that certain of the plaintiffs, by the execution of various division orders approving the sale of the gas by the defendant, and by the acceptance of and acquiescence in payments made by defendant to plaintiffs, legally and equitably estopped plaintiffs from seeking any relief claimed in the Complaint.

## FINDINGS OF FACT

The Court makes the following Findings of Fact:

1. The Court finds that it has jurisdiction, and has jurisdiction to determine the rights of the parties and without infringing upon the jurisdiction of the Federal Power Commission.

2. Beginning in the late 1940's and in the 1950's an important gas field was discovered and developed in Major County, Oklahoma, generally referred to as the Ringwood Field located in Townships 21 and 22 North, Ranges 9, 10, 11 and 12 West. This field produced large volumes of gas which was processed through a gasoline plant located in Section 34, Township 22 North, Range 10 West, Major County, Oklahoma, approximately 6 to 9 miles south of the Chaney Dell area involved in the present case. On the 31st day of December, 1960, Livingston Oil Company, a producer of gas in the Ringwood area, entered into a gas purchase contract with Warren Petroleum Corporation and Oklahoma Natural Gas Company, as buyers, (plaintiffs' Exhibit "8") to purchase the gas and process it through Warren's (also referred to as "National Fuels") plant at the following prices, to-wit:

January 1, 1961, to December 31, 1965, 11 cents per mcf.

January 1, 1966, to December 31, 1970, 12 cents per mcf.

January 1, 1971, to December 31, 1975, 13 cents per mcf.

January 1, 1976, for the remainder of the terms of this contract, 14 cents per mcf.

And for liquids and liquid products, the Livingston Contract provided that the buyer should pay to the seller (Livingston) for each thousand cubic feet of raw gas delivered 50 per cent of the weighted average net value of all liquid products contained in the raw gas delivered to buyer.

The Livingston contract set out in detail the methods of measuring the gas and in determining the weighted average net value of the liquids, and other provisions relating to such contracts as is generally used in the industry.

3. By a 20-year contract bearing the date June 1, 1965, (Plaintiffs' Exhibit "3") it was agreed between Amerada Petroleum Corporation, Champlin Petroleum Corporation, Engar Company, a limited partnership, Harper Oil Company, a corporation, and W. C. Payne, a joint venture, owners of the Enid Gasoline Plant, as buyer, and Champlin Petroleum Company, as seller, for the purchase and sale of gas from the Chaney Dell area, for the gas covered by the leases on property owned by the plaintiffs, by the general terms of which Article VIII, sub-paragraphs 8.1, 8.2, 8.3 and 8.4 fixed the price for the purchase of the Chaney Dell gas at 85 per cent of the weighted average proceeds received by buyer from the sale at the tailgate of buyer's plant of the "volume of residue gas attributable to the gas purchased and delivered hereunder," and then provided in the remaining paragraphs of this Article for the measurement of the

gas and other miscellaneous provisions. This contract made no provision for the payment of any sum or sums for the liquids recovered from said raw gas or subsequent increase in value of gas.

4. The Enid Gasoline Plant, as the buyer of the gas to be produced from the Chaney Dell area, was co-owned at the time of the contract by the named purchasers with Champlin Petroleum Company owning slightly in excess of 50 per cent interest in the plant. Enid Gasoline Plant was located between 20 and 28 miles from the Chaney Dell area, and at the time of the contract to purchase the gas, June 1, 1965, Enid Gasoline Plant had no pipeline to, or gathering system in, the Chaney Dell area, but the contract, (Plaintiffs' Exhibit "3") states that the buyer was constructing or had constructed a system of pipelines to the Chaney Dell area. The Court further finds in this connection that by this contract, June 1, 1965, Champlin Petroleum Company, as the owner and operator of the oil and gas leases in which the plaintiffs are interested, committed the sale of plaintiffs' gas to the Enid Gasoline Plant, which it had a right to do. However, prior to this formal contract, defendant committed this gas to the Enid Gasoline Plant by letters dated January 29, 1965, and February 19, 1965, which commitment was accepted by the Enid Gasoline Plant. So the actual date of commitment was no later than February 19, 1965.

5. At the time the gas commitments were entered into, Champlin Petroleum Company was the owner of a large proportion of the leases and gas production in the Chaney Dell area.

6. When the contract to sell gas to the Enid Gasoline Plant was entered into by Champlin Petroleum Company, operator of both the leases involved in this case, and the Enid Gasoline Plant, plaintiff lessors, owners of royalty interests under the leases were not consulted with respect to this contract. However, long after the execution of the gas contract, Champlin Petroleum Company, as the operator of the Enid Gasoline Plant,

procured from some of the plaintiffs, as a prerequisite to payment for their interest in the gas, what is termed in the industry as a "division order" (Defendant's Exhibit "8"), wherein among other things it is stated "the undersigned, * * * do hereby ratify and confirm the above described gas purchase contract and do hereby agree to accept the prices therein set out as full settlement for the interest of each of them in the gas produced from the above described property." These division orders set forth the names of the owners and their respective interests in the production, and nowhere is price mentioned or referred to, and the Court finds in this connection that the plaintiffs in this case as lessors and/or royalty owners did not see, examine nor were they advised of the terms of the gas purchase contract, nor were they furnished a copy for examination, except on request.

7. The evidence conclusively shows and the Court finds that Champlin Petroleum Company made absolutely no effort to find a market for the gas involved in this case belonging to the royalty owners and itself and did not seek a purchaser for the gas although the Ringwood Plant was located in close proximity to the Chaney Dell area, although Champlin Petroleum Company was selling some of its gas to the Ringwood Plant from leases co-owned with Livingston Oil Company and receiving a net price of approximately 17 to 18 cents per thousand cubic feet therefor.

Mr. William S. Jones, the manager of Natural Gas Operations for Champlin Petroleum Company, testified by deposition beginning on page 29 as follows:

"Q. You don't know whether or not anybody would have bought it?

A. Yes, sir; I do. Because I had no offers.

Q. Well, did you try to find anybody?

A. (No Answer)

Q. I believe you said you didn't try to find anybody.

A. No. That's right."

and at page 30:

"Q. Did you talk to National Fuels (Ringwood Plant) about whether or not they wanted to buy the gas?

A. National Fuels—to turn it around, National Fuels didn't talk to me, and I didn't talk to National Fuels.

Q. You didn't call them and ask them if they wanted to buy this gas?

A. No, sir."

and at page 31:

"Q. You are assuming that they wouldn't because they didn't come and tell you they wanted to buy it?

A. Yes, sir."

8. The Court finds that at the time of the Champlin-Enid Gasoline Plant contract, the construction of a gas plant in the Chaney Dell area was feasible for a profitable operation; that during late 1965 or early 1966 two such plants were built in the area and are and have been paying for gas purchased, a sum in excess of that being paid by Champlin to plaintiffs for their gas.

9. In 1965 when Champlin Petroleum Company, as the operator of the Enid Gasoline Plant, commenced building a pipeline to the Chaney Dell area, there were approximately 9 to 10 million cubic feet of gas per day for sale, together with a large potential for additional gas from undeveloped acreage in the area and with 68 to 95 billion cubic feet of ultimate reserves.

10. The leases operated by the defendant and executed by the lessors, plaintiffs in this case or their predecessors in interest, do not contain identical provisions for the payment of gas royalties or the method of fixing the amount of payment in money, to be made to lessors for their gas. Ten separate types of royalty provisions are contained in the leases under consideration in this case. In answer to Interrogatories filed by the defendant in this case on November 12, 1968, the various types of royalty provisions are set forth. These royalty provisions are attached hereto and marked Exhibit "1" and made a part of these Findings. Generally, however, these various provisions provide for the payment to the lessors for their royalty "the prevailing market price for gas", "value of raw gas at the mouth of the well", "market value at the mouth of well", and "proceeds of sale." The defendant in committing this gas under its gas sales contract, and providing for the payment of royalties made no distinctions between the phraseology of the respective leases or method of settlement, but treated them alike.

11. The Court finds that the total value at the wellhead of the gas is the controlling factor, and this wellhead value is determined by a portion of the liquid proceeds from the gas, or a portion of the tailgate residue proceeds, or both. In the case at bar, the defendant attempted to fix the value of the gas at the wellhead by basing it upon the proceeds from the residue gas, and without regard to the technical legal distinctions that may be made in interpretation of the various royalty provisions as contained in the leases in this question as shown by the attached Appendix to these Findings.

12. As a further argument, the defendant states that the Enid Gasoline Plant spent approximately $1,800,000 in running the pipeline from the Enid Gasoline Plant to the Chaney Dell gas field and installing gathering systems to each well and the equipment to the wells and stations, and that the Enid Gasoline Plant has a projected ultimate loss in the amount of $600,000. Based upon this expenditure and loss, the defendant claims the right to sell plaintiffs' gas based upon the aforementioned gas purchase and sales contract. This argument is untenable inasmuch as the plaintiffs have no interest in the question of profit and loss of the Enid Gasoline Plant or the profit and loss of the defendant here, and their sole interest is

to have and receive the market value of their gas as herein pointed out.

13. The Court finds from a consideration of all the evidence and circumstances in this case that the value of plaintiffs' gas at the mouth of the well was fixed and determined in the producing area involved, by the agreement between Livingston Oil Company, as seller, and Oklahoma Natural Gas Company and Warren Petroleum Corporation, as buyers, dated December 31, 1960, being plaintiffs' Exhibit "8"; that the formula fixed by this contract determines the value of plaintiffs' gas at the mouth of the well. The evidence shows that prior to the time of the contract between Champlin Petroleum Company and the Enid Gasoline Plant, the Ringwood Plant operated by Warren Petroleum Company (now National Fuels) had extended its gathering lines into the southern portion of the Chaney Dell area, and was purchasing gas from wells in the present Chaney Dell area prior to the time of the contract between Champlin and the Enid Gasoline Plant. Defendant did not go so far as to inquire whether it could market its gas to the Ringwood Plant.

14. The Court finds that what is referred to as the Ringwood area and the Chaney Dell area are, in fact, one general producing area, and the Chaney Dell area is merely an extension of and overlapping the older Ringwood area, and the gas produced is of like kind and quality.

15. The Court finds that had it not been for the defendant's failure, or it might be said from its refusal, to seek out a market for the gas from the Chaney Dell area, and due to its dominant position as a leaseholder in the Chaney Dell area, and its dominant interest in the Enid Gasoline Plant, a market could have easily been found for the gas from the Chaney Dell area at prices or at a value based upon the formula as fixed and determined by the Livingston contract (Plaintiffs' Exhibit "8"), and in excess of that provided by plaintiffs' Exhibit "3".

16. The Court finds that defendant Champlin has paid plaintiffs for their share of the gas, prices ranging from 9.-067 cents per mcf to 10.822 cents per mcf, while other purchasers have been paying prices ranging from a minimum of 12 cents per mcf to 17 cents per mcf for the same gas from the field.

17. The Court finds that the defendant did not exercise due diligence to find a market for the gas having due regard for plaintiffs' interest, and thus breached its duty in their regard.

18. The Court finds that the defendant breached its duty, as the owner of more than 50 per cent of the Enid Gasoline Plant and operator of the plant, in failing to account to plaintiffs for the prevailing market price for their gas.

19. The Court further finds that the "division order" executed by some of the plaintiffs is ineffective because of lack of consideration; lack of knowledgeable consent, and meaningful choice; the defendant did not advise plaintiffs of its dominant ownership of the Enid Plant and did not advise the plaintiffs of the price to be received by them for gas, nor of its breach of duty to seek out a purchaser for the gas. Under such circumstances revealed in this case the Court should not uphold the division orders.

20. The defendant considering all of the above mentioned facts did not deal openly, fairly and in good faith with plaintiffs, which was its duty and obligation.

21. The word "gas" as used in this Opinion means "casinghead gas" and the words "royalty" or "royalty owners" refers to lessors and their successors in interest and to owners of overriding royalty interests, and gas payments granted or reserved.

22. The Court finds that certain royalty interest holders have filed with the Court as provided by Rule 23(c) (2) Federal Rules of Civil Procedure to be excluded from the class, and they should and will be excluded.

## CONCLUSIONS OF LAW

■ The defendant, Champlin Petroleum Company, as lessee under oil and gas leases involved in this case has an implied duty and obligation in the exercise of reasonable diligence, as a prudent operator, with due regard for the interest of both lessor and lessee, to obtain a market for the gas produced from the lands in question at the prevailing market price therefor. Gazin v. Pan American Petroleum Corporation, et al., 367 P.2d 1010 (Okl.); Harding v. Cameron, 220 F.Supp. 466 (D.C.Okl.); Townsend, et al. v. Creekmore-Rooney Company, et al., 358 P.2d 1103 (Okl.); Gilmore v. Superior Oil Company, 192 Kan. 388, 388 P.2d 602. A failure to comply with such duty, or to ignore such duty renders the defendant liable to the plaintiffs for any resulting loss.

■ The defendant, as lessee under the oil and gas leases, was the owner of the entire ⅞ of the gas when produced and had control of the disposition thereof, and having such ownership and control, and duty as above set forth, it stands in the position similar to that of a trustee, and when it breaches its duty as such fiduciary, and disposes of the interest of plaintiffs in the gas produced, it becomes liable to the plaintiffs for any resulting loss. Young, et al. v. West Edmond Hunton Lime Unit, 275 P.2d 304 (Okl.); Harding v. Cameron, supra.

■ The defendant contends that certain of the plaintiffs executed to it division orders approving the sale of the gas by the defendant, and the acceptance of payments made by the defendant, and therefore, the plaintiffs are legally and equitably estopped from seeking any relief from the defendant and that plaintiffs are bound by the contract between defendant and Enid Gasoline Plant. In view of the duties owed by the defendant, and its action or nonaction, as revealed by the Findings, its contention is untenable. The plaintiffs, being entitled to the prevailing market price for gas in the field where produced, are not estopped to claim royalties based on market price because they had accepted royalties under a 20-year gas contract providing for lower rates, since the lessee could contract for the sale of the gas, and without interference by the lessors. Zara Foster, et al. v. Atlantic Refining Company, 329 F.2d 485 (C.A. 5). And where a lessor has an obligation to pay royalties on the basis of "prevailing market price for gas" or "market value at mouth of well" or "proceeds of sale" sells or commits the gas of the plaintiffs for a price less than the market price prevailing in the field, this does not destroy or lessen the obligation of the lessee to pay royalties at the prevailing market price.

■ The Court concludes that it has jurisdiction in this case as a class action under Rule 23 of the Federal Rules of Civil Procedure to determine the rights between the parties hereto.

Attorneys for plaintiffs have asked for an attorneys' fee to be fixed for them in this case. The question of fees will be withheld until the conclusion of the accounting that will be ordered.

An appropriate Interlocutory Judgment will be entered upholding plaintiffs' right to an accounting and denying plaintiffs' right to cancellation of the leases involved.

### EXHIBIT 1

### TYPES OF GAS ROYALTY PROVISIONS

1. To pay lessor for gas produced from any oil well and used off the premises, or for the manufacture of casinghead gasoline or dry commercial gas, one-eighth of the proceeds, at the mouth of the well, as the prevailing market rate for the gas during which time such gas shall be used, said payments to be made monthly.

2. The lessee shall pay the lessor: (a) ⅛ of the proceeds received by the lessee from the sale of casinghead gas, produced from any oil well; (b) ⅛ of the value, at the mouth of

the well, computed at the prevailing market price, of the casinghead gas, produced from any oil well and used by lessee off the leased premises for any purpose or used on the leased premises by the lessee for purposes other than the development and operation thereof.

3. To pay lessor for gas produced from any oil well and used off the premises $\frac{1}{8}$ of the value of the raw gas at the mouth of the well, payment for the gas so used or sold to be made quarterly.

4. To pay lessor $\frac{1}{8}$ of the proceeds received by lessee at the well for all gas (including all substances contained in such gas) produced from the leased premises and sold by lessee; if such gas is used by lessee off the leased premises or used by lessee for the manufacture of casinghead gasoline or other products, to pay to lessor $\frac{1}{8}$ of the prevailing market price at the well for the gas so used.

5. On gas, gas condensate, gas distillate, casinghead gas and all other gases, including their constituent parts, produced from said land and sold or used off the lease premises or in the manufacture of gasoline or other products, lessee shall pay to lessor a sum equal to $\frac{1}{8}$ of the gross proceeds received from the sale of such produced substances where the same is sold at the mouth of the well or, if not sold at the mouth of the well, then $\frac{1}{8}$ of the market value thereof at the mouth of the well, but in no event more than $\frac{1}{8}$ of the actual amount received by lessee for the sale thereof.

6. The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other products as royalty $\frac{1}{8}$ of the market value of such gas at the mouth of the well; if said gas is sold by the lessee, then as royalty $\frac{1}{8}$ of the proceeds of the sale thereof at the mouth of the well.

7. The lessee shall pay to lessor for gas produced from any oil well and used by the lessee for the manufacture of gasoline or any other products, as royalty, $\frac{1}{8}$ of the market value of such gas at the mouth of the well. If said gas is sold by the lessee, then as royalty $\frac{1}{8}$ of the proceeds of the sale thereof.

8. To pay lessor for gas produced from any oil well and used off the premises or in the manufacture of gasoline or any other product a royalty of $\frac{1}{8}$ of the proceeds, at the mouth of the well, payable monthly at the prevailing market rate.

9. On gas, including casinghead gas and other vaporous or gaseous substances, produced from said land as follows: (i) In case lessee shall itself use gas in the manufacture of gasoline or other petroleum products therefrom $\frac{3}{16}$ of the sale price at the plant of the gasoline or other petroleum products manufactured or extracted therefrom and which are saved and marketed, after deducting a fair and reasonable cost for extracting or manufacturing said gasoline or other substance, and $\frac{3}{16}$ of the market value of residue gas sold or used by lessee in operations not connected with the land herein leased. No deduction for extraction costs shall be made for liquid hydrocarbons recovered by use of drip, separator or similar apparatus on the flow line of wells, and, except as to gas being used for repressuring or recycling purposes, upon written request by lessor, lessee shall, prior to the sale or use of gas from such wells, install and use such apparatus on any well or wells capable of producing liquid hydrocarbons in paying, commercial quantities, (ii) In the event lessee shall sell gas at the wells, $\frac{3}{16}$ of the amount received from such sales, (iii) In all cases. when sold or used off the

premises, the price received at the well for ⁹⁄₁₆ of the gas sold or ⁹⁄₁₆ of the fair value of gas used.

10. To pay lessor for gas of whatsoever nature or kind produced and sold, or used off the premises, or used in the manufacture of any products therefrom, ⅛, at the market price at the well for the gas sold, used off the premises, or in the manufacture of products therefrom, said payments to be made monthly.

## SPECIAL FINDINGS AND ORDER ON JURISDICTION

This cause came on regularly for hearing, pursuant to notice on the 9th day of May, 1969, upon Motion of defendant, Champlin Petroleum Company, to remand this cause to the State Court from whence it was removed because of this Court's lack of jurisdiction of the subject matter.

A brief history of prior proceedings in this cause may be helpful. This cause was originally filed in the District Court of Major County, Oklahoma, and the defendant here, Champlin Petroleum Company, removed this case to this Court, and the case was docketed here as Civil No. 66–143. Upon Motion of the plaintiffs, Honorable Luther B. Eubanks, District Judge, remanded the case to the District Court of Major County, Oklahoma, holding that defendants in the action, other than petitioner, who resided in Oklahoma, were necessary parties to the cause of action alleged against the petitioner, Champlin. Following the remand, plaintiffs filed an Amended Petition in the State Court to which Demurrers were filed, and the State Court of May 2, 1967, dismissed from the case all defendants other than petitioner there, defendant here Champlin Petroleum Company. Thereafter, the defendant here, Champlin Petroleum Company, filed Petition for Removal, and the same was docketed here as Civil No. 67–197. Plaintiffs filed no Motion to Remand.

In Plaintiffs' Amended Complaint in the State District Court, it is alleged in numerical paragraph 6 as follows:

"Plaintiffs further allege that the exact amount of damages which plaintiffs have sustained is unknown to said plaintiffs at this time but is the knowledge of the defendants, but that plaintiffs allege and believe that they have been damaged in the sum of $75,000.-00."

After removal, and after the case was docketed here, plaintiffs filed a Third Amended Petition, alleging substantially the same operative facts that were set forth in the State Court Petition and further alleged that due to the breaches of the leases involved, plaintiffs were entitled to rescind the oil and gas leases in question, and plaintiffs did pray for such relief in addition to relief for an accounting. This amendment was allowed by the Court without objection by defendant, Champlin Petroleum Company.

A pretrial conference was held on the 21st of September, 1967, and all parties were represented by counsel. The Pretrial Order was filed on October 4, 1967, in which, among other things, it is stated as one of the plaintiffs' contentions as follows:

"That by reason of the breach of the express or implied covenants of the leases referred to above, the plaintiffs are entitled to either:

(1) Cancellation of said leases; or

(2) Damages consisting of the difference between the prevailing market price and what was actually paid, etc. * * *."

Defendant now claims that based upon the opinion of the Supreme Court of the United States handed down on March 25, 1969, in the case of Snyder v. Harris, et al and Gas Service Company v. Coburn, 394 U.S. 332, 89 S.Ct. 1053, 22 L.Ed.2d 319 this Court is without jurisdiction of the subject matter.

In the Synder case, supra, the Court had under consideration an action or actions originally filed in the United States

District Court, and each suit was filed by one individual, on behalf of all others similarly situated. Admittedly neither plaintiff had a claim involving an amount in controversy in excess of $10,000 exclusive of interest and costs, and the Supreme Court held that the claims of the plaintiffs and all those others similarly situated could not be aggregated to reach the jurisdictional amount.

In the case at bar which is not an action originally brought in the Federal District Court, but is a removed action, the Petition filed in the State Court seeking damages in the sum of $75,000, it is not alleged that any one of the plaintiffs had a claim meeting the jurisdictional requirements of the Federal Court, however, neither does the Petition show that one or more of the plaintiffs do not have such an amount in controversy.

Under 28 U.S.C., Section 1441, an action brought in a State Court may be removed to a United States Court if the United States Court would have had original jurisdiction of the case had it been brought originally in the Federal Court.

■ The amount in controversy as prayed for in the State Court Petition as concerns anyone of those plaintiffs, is not clearly set forth, but on the face of the Petition, the amount in controversy did exceed $10,000 exclusive of interest and costs; the fact that a plaintiff or plaintiffs may recover less than the jurisdictional amount, after the case has been removed, does not defeat jurisdiction because Congress has provided by Section 1332(b) of 28 U.S.C. as follows:

"Except when express provision therefor is otherwise made in a statute of the United States, where the plaintiff who files the case originally in the Federal courts is finally adjudged to be entitled to recover less than the sum or value of $10,000 * * * the district court may deny costs to the plaintiff and, in addition, may impose costs on the plaintiff."

Clearly then a case removed from a State Court to a Federal Court stands on the same footing as a case which was originally filed in the United States Court so far as the amount in controversy is concerned, and if less than the jurisdictional amount is recovered, this does not defeat the Court's jurisdiction.

It is a fundamental rule that after removal from a State Court, pleadings may be amended or changed for various reasons. Amendments are permitted by Rule 15, and amendments relate back to the date of the original pleading. This is especially so where the primary operative facts set forth in the original Petition and in the amended Complaint are the same, except for the relief demanded. So examining the pleadings, before removal and after removal as amended, what was the posture of the case when it was called for trial in this Court? Did this Court have jurisdiction upon the face of the pleadings? When the case was called for trial in this Court, the claim for relief as alleged in the amended Complaint, and as set forth in the Pretrial Order was as follows:

(1) That the oil and gas leases between the plaintiffs and the defendant be rescinded and cancelled.

(2) Alternatively, (a) that plaintiffs be granted an accounting * * * etc.

■ The defendant asserts, and rightly so, that jurisdiction of the subject matter of an action cannot be waived, nor can it be conferred by consent of the parties and can be raised at any time. Defendant places much reliance upon American Fire & Casualty Co. v. Finn, 341 U.S. 6, 71 S.Ct. 534, 95 L.Ed. 702. In this case the pleadings on their face, when removed to the Federal Court show that the Court did not have jurisdiction, and never acquired jurisdiction by the pleadings, amended or otherwise, as there was no separate and independent claim involving the removing nonresident defendant, and therefore, no right to remove.

In the case at bar, the Court had jurisdiction from the beginning based upon the allegations of the Petition, and the

allegations contained in the Petition for Removal, while in the American Fire case, supra, the Court never had jurisdiction based upon the allegations of the Complaint.

Where the amount in controversy is a prerequisite to Federal jurisdiction, the party invoking the Federal Court's jurisdiction has the burden of establishing the requisite amount in controversy. McNutt v. General Motors Acceptance Corp., 298 U.S. 178, 56 S.Ct. 780, 80 L.Ed. 1135. Champlin, the defendant here, in its Petition for Removal alleged the amount in controversy to exceed the jurisdictional amount, and absent a challenge by plaintiffs, the Court had a right to accept defendant's pleading.

Upon the hearing of this Motion, the Court permitted the parties to introduce such evidence as they cared to present touching upon the amount in controversy. Named plaintiffs introduced into evidence Exhibit 1 which shows that the amount or value in controversy of each of the plaintiffs in this case exceeded the jurisdictional amount as required by 28 U.S.C., Section 1332, ranging from $11,340 to $65,520.

In American Fire & Casualty Co. v. Finn, supra, the Supreme Court said:

"There are cases which uphold judgments in the district courts even though there was no right to removal. In those cases the federal trial court would have had original jurisdiction of the controversy had it been brought in the federal court in the posture it had at the time of the actual trial of the cause or of the entry of the judgment. That is, if the litigation had been initiated in the federal court on the issues and between the parties that comprised the case * * *."

Assuming, arguendo, that only one of the plaintiffs in the State Court case had a claim meeting the requisite amount for Federal jurisdiction, the case was removable as provided by Section 1441(c) of Title 28 U.S.C. which reads:

"Whenever a separate and independent claim or cause of action, which would be removable if sued upon alone, is joined with one or more otherwise non-removable claims or causes of action, the entire case may be removed and the district court may determine all issues therein, or, in its discretion, may remand all matters not otherwise within its original jurisdiction."

This Court, after removal, had the authority under the rules to permit amendments as was said in Christensson v. Hogdal, 91 U.S.App.D.C. 251, 199 F.2d 402.

"But even though the complaint was defective because it sought 'other relief,' and though we may further assume that under 35 U.S.C.A. § 72(a) this defect was jurisdictional, it does not follow that the District Court lacked power to permit the amendment which Christensson requested. Technical defects in jurisdiction have long been subject to correction in the course of judicial proceedings * * *. The modern rule is liberal in permitting the amendment of pleadings to show that the court has jurisdiction."

In the case of Donahue et al. v. Warner Bros. Pictures, Inc. (10 C.A.) 194 F.2d 6, the Court at page 10 said:

"While the cause was not subject to removal on the ground of a separate and independent claim or cause of action against the removing defendants, complete diversity of citizenship existed between all plaintiffs on one hand and all defendants on the other; two of the defendants were citizens of Utah; and more than three thousand dollars, exclusive of interest and costs, was involved. Therefore, the action was one falling within the original jurisdiction of the United States Court for Utah, and plaintiffs could have instituted it in that court in the first instance. After removal, plaintiffs did not challenge the removability of the cause either by motion to remand or otherwise. Instead, they filed an

amended complaint in which both legal and equitable relief was affirmatively sought. Parties cannot by consent confer upon a court jurisdiction of the subject matter of an action which it would not have possessed without such consent. Neither can voluntary action of parties in the nature of waiver confer jurisdiction of an action if the court would not have had jurisdiction of the subject matter without the waiver. But where a suit of which the United States Court may entertain original jurisdiction is instituted in the state court and the defendant obtains its removal even though removal is wholly unauthorized, and plaintiff acquiesces in such removal by seeking relief from the United States Court, that court acquires jurisdiction of the subject matter. Lopata v. Handler, 10 Cir., 121 F.2d 938; Cf. American Fire & Casualty Co. v. Finn, supra. The case being one of which the United States Court for Utah could have entertained original jurisdiction, and plaintiffs having acquiesced in the removal of it, the United States Court had jurisdiction; and its remand now is not required."

See also International Ladies Garment Workers Union v. Donnelly Garment Company, 121 F.2d 561 (8 C.A.); John M. Peters Construction Company v. Marmar Corporation, 329 F.2d 421 (6 C.A.); Foman v. Davis, 371 U.S. 178, 83 S.Ct. 227, 9 L.Ed.2d 222.

In 3 Moore's Federal Practice, page 1031 it is said:

"An amendment which changes the jurisdictional basis of an action will also relate back, the factual situation alleged otherwise remaining unaltered."

And 28 U.S.C.A. § 1653 states as follows:

"Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts."

The case having properly been removed to this Court, or improperly removed, jurisdiction was supplied by later amendments, then the function of the class action rule provided by Rule 23 would come into operation. This case is a classic one for the application of the class action rule and meets all the prerequisites as provided in Rule 23.

The Court holds and finds that it has jurisdiction of the subject matter of this action including the plaintiffs and all others similarly situated, and defendant's Motion suggesting the Court's lack of jurisdiction and for remand should be, and the same is hereby denied.