WINNIE PIPELINE V. HARRINGTON



NO. 07-05-0049-CV



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL D



APRIL 6, 2005


______________________________



HAZEL LOVE, also known as


HAZEL LEA LOVE and HAZEL PUTMAN CAGLE,



 Appellant


v.



JAMES COX,



 Appellee

 _________________________________



FROM THE COUNTY COURT AT LAW NO. 3 OF LUBBOCK COUNTY;



NO. 2003-593,918; HON. PAULA LANEHART, PRESIDING


_______________________________



On Motion to Dismiss


_______________________________



Before QUINN, REAVIS and CAMPBELL, JJ.

 Hazel Love, appellant, and James Cox, appellee, by and through their attorneys,
have filed a motion to dismiss this appeal with prejudice because the parties have fully
compromised and settled all issues in dispute and neither desire to pursue the appeal. 
Without passing on the merits of the case, we grant the motion to dismiss pursuant to
Texas Rule of Appellate Procedure 42.1(a)(2) and dismiss the appeal. Having dismissed
the appeal at the parties' request, no motion for rehearing will be entertained, and our
mandate will issue forthwith. 

 

 Brian Quinn

 Justice



:WrapTextWithPunct/>
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 
 









NO. 07-09-00059-CV

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL E

 



JANUARY
31, 2011

 



 

OCCIDENTAL PERMIAN LTD.,

 

                                           
APPELLANT/CROSS-APPELLEE

v.

 

THE HELEN JONES
FOUNDATION, ET. AL.,

                                              
APPELLEES/CROSS-APPELLANTS

v.

 

BP AMERICA PRODUCTION COMPANY, ET. AL.,

 

                                                  
   CROSS-APPELLEES 

___________________________

 

FROM THE 286TH DISTRICT COURT OF HOCKLEY COUNTY;

 

NO. 06-01-20302; HONORABLE ANDREW J. KUPPER, JUDGE



 



 

Before CAMPBELL
and PIRTLE, JJ., and BOYD, S.J.[1]

 

 

OPINION

 

Owners
of royalty interests[2]
in lands in the Slaughter Field[3]
brought suit seeking damages for underpaid royalties on casinghead
gas[4]
against the current lease operator, Occidental Permian Ltd. (OPL), and two
former operators of the leases.  The
royalty owners also asserted a claim against OPL for royalties on carbon
dioxide.  The trial court granted summary
judgment for the operators on some claims, and a jury heard the remaining
claims.  After a verdict in favor of the royalty owners, the trial court signed a
judgment disregarding the jurys award of attorneys fees against OPL but
otherwise awarding the damages found by the jury as to OPL.  The judgment ordered that the royalty owners
take nothing from the former operators. 

The
royalty owners appeal the trial courts grant of summary judgment, its denial
of their attorneys fees and the take-nothing judgment against the former
operators.  OPL appeals the judgment
against it.  

We
will render judgment that the royalty owners take nothing from OPL.  We will affirm the summary judgment, the
denial of attorneys fees and the take-nothing judgment as to the former
operators.  We will remand the case for
entry of a new judgment consistent with this opinion and law.  We will otherwise affirm the judgment.  

Background

As
to the royalties on casinghead gas, six oil and gas
leases are at issue.  The parties agree
that the royalty on casinghead gas under four of the
leases is one-eighth of
the amount realized from such sale when gas is sold at the wells. The other
two leases, the parties also agree, provide a royalty on casinghead
gas of three-eighths of its market value in the field.[5]

            The
six leases range in date from 1934 through 1944.  The Slaughter Field is an oil-producing
field, and the casinghead gas was flared until
sometime in the 1940s when, according to testimony, the Railroad Commission
prohibited the practice.  In the late
1940s, eight lessees, including the defendants predecessor Stanolind
Oil and Gas Company, jointly constructed the Slaughter Gas Processing
Plant.  The plant began operation in
1949.

The lessees individually entered into
Casinghead Gas Contracts, beginning in 1947, by which
they sold the casinghead gas produced on their leases
to the plant owners.  The gas contracts
were percentage of proceeds contracts, by which the plant agreed to pay the
lessees 50% of the proceeds from the sale of processed residue gas and 33.3% of
the proceeds from the sale of natural gas liquids (NGLs) from the plant.[6]  The term of these gas sales contracts was for
the life of the Slaughter Plant.[7]

In the 1960s, units were formed for
the purpose of conducting secondary recovery operations, such as waterfloods, to enhance production of oil in the
field.   Then in the 1980s tertiary
recovery operations were commenced, by which carbon dioxide is injected into
the producing formation, also for the purpose of maintaining and enhancing
production of oil.  The injected CO2
becomes commingled with hydrocarbons in the producing formation and comes back
to the surface along with the casinghead gas.  

            High
levels of CO2 interfere with the processing of gas in the Slaughter
Plant.[8]  As the CO2-injection program
expanded in the field, levels of CO2 in the casinghead
gas increased.  And the injected CO2
migrated to nearby units, so casinghead gas produced
from wells outside the units in which CO2 was being injected also
experienced increased CO2 levels. 
During the mid-1980s, the owners of the Slaughter Plant constructed the
adjoining Mallet Plant to process gas with high CO2
concentrations.  The CO2
extracted from the gas at the Mallet Plant is returned to the unit operator for
reinjection into the oil-producing formation. 
The CO2 thus follows a continuous cycle of injection,
recovery, processing and re-injection. 
The casinghead gas, shorn of CO2,
is piped from the Mallet Plant to the Slaughter Plant for further processing.

            In
1996, BP America Production Company, then known as Amoco Production Company,
became operator of the Slaughter and Mallet Plants and operator of the leases
at issue in the litigation.  It later was
succeeded as operator of the plant and leases by Altura
Energy Ltd.  In 2000, OPL acquired both
the leases and the plants. Thus, OPL now is both seller and buyer of the casinghead gas under the gas sales contracts.

            Under
the terms of the casinghead gas sales contracts, the casinghead gas is delivered to the buyer at or near the
wellhead.  Evidence showed that after the
gas is gathered from the leases, and processed through the Mallet and Slaughter
plants, the NGLs extracted from the gas stream, and the residue gas available
for sale after processing, are transferred to OPLs affiliated company
Occidental Energy Marketing, Inc. (OEMI). 
OEMI markets the extracted NGLs at Mont Belvieu,
Texas, near the Houston Ship Channel, and the residue gas at Waha, an El Paso Natural Gas Co. marketing hub in Pecos
County.   

            In
their suit against BP America Production Company, Altura Energy Ltd. (who we will refer to jointly as BP) and
OPL, the royalty owners
contended (1) BP and OPL breached the four amount-realized leases by failing to
pay royalty calculated on the actual amount they realized from sale of casinghead gas; (2) BP and OPL breached an implied covenant
in the amount-realized leases by failing to market the casinghead
gas as would a reasonably prudent operator; (3) under the two market-value
leases, BP and OPL did not calculate casinghead gas
royalties on its market value in the field; and (4) OPL failed to pay a royalty
on the CO2 separated from the gas at the Mallet Plant.  The royalty owners moved for partial summary
judgment seeking a declaration that OPL owed a royalty on CO2.  By cross-motion, OPL sought a declaration
that the CO2 was not subject to its royalty obligation.  The trial court agreed with OPL and granted a
partial summary judgment accordingly. 
The remaining issues were tried to the jury. 

            The
jury found for the royalty owners on all liability theories submitted and
awarded them attorneys fees.  The trial
court granted judgment notwithstanding the verdict in favor of BP on its
statute of limitations defense[9]
and in favor of OPL on the award of attorneys fees.  The court then rendered judgment that the
royalty owners recover $7,064,674 from OPL and take nothing from BP.  As noted, both OPL and the royalty owners appeal.

Analysis

Issues Tried to Jury

            Through
three issues OPL contends no evidence supported the jurys findings of
liability and damages for: (1) the failure to pay royalties according to the
amount-realized leases; (2) the breach of the implied duty to market in the
amount-realized leases; and (3) the underpayment of royalties on the
market-value leases.  BP raises the same
arguments in response to the royalty owners cross-appeal.[10]  By cross-appeal, the royalty owners argue the
trial court erred in granting judgment notwithstanding the verdict on BPs
statute of limitations defense and in favor of BP and OPL on the royalty
owners request for attorneys fees.  

            When
conducting a legal sufficiency review, we view the evidence in a light most
favorable to the judgment and indulge every reasonable inference to support it,
crediting favorable evidence if a reasonable factfinder
could, and disregarding contrary evidence unless a reasonable factfinder could not. 
City of Keller
v. Wilson, 168 S.W.3d 802, 807, 822 (Tex. 2005).  Anything more than a scintilla of evidence is
legally sufficient to support the finding. 
Contl Coffee Prods. Co. v. Cazarez, 937 S.W.2d 444,
450 (Tex. 1996).  When
evidence is so weak as to do no more than create a
mere surmise or suspicion that a fact exists, the evidence does not exceed a
scintilla.  Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004) (quoting Kindred v. Con/Chem,
Inc., 650 S.W.2d 61, 63 (Tex. 1983)). 

            The
Amount-Realized Leases

As noted, the royalty clause of the
four amount-realized, or proceeds, leases specifies a royalty on casinghead gas sold at the wells of one-eighth of the
amount realized from the sale.  OPL
contends the evidence conclusively shows it paid royalties in accordance with
the royalty clause, and we agree.

An oil and gas lease is a contract
and interpreted accordingly.  Tana
Oil & Gas Corp. v. Cernosek, 188 S.W.3d 354, 359 (Tex.App.--Austin
2006, pet. denied).  It is a basic tenet of our law that competent parties enjoy
the utmost freedom of contract and courts will enforce a contract freely and
voluntarily made for a lawful purpose.  Crutchfield v. Associates
Investment Co., 376 S.W.2d 957, 959 (Tex.Civ.App.--Dallas
1964, writ refd).  Contract terms are given their plain,
ordinary, and generally accepted meanings unless the contract itself shows them
used in a technical or different sense.  Valence Operating Company v.
Dorsett, 164 S.W.3d 656, 662 (Tex. 2005).  

It is undisputed that the casinghead gas is sold at the wells, and that the lessor is entitled to royalties based on the amount
realized from the wellhead sale.  See Tana Oil &
Gas Corp., 188
S.W.3d at 360 (applying
amount-realized royalty provision); see
generally Exxon Corp. v. Middleton, 613 S.W.2d 240, 242-44 (Tex. 1981)
(construing gas sold at the wells royalty provision). Amount realized means
the proceeds received from the sale of gas or oil.  Tana Oil & Gas,
188 S.W.3d at 360. 
At the well means before value is added by processing the raw gas for
market.  Id.  

It is further undisputed that, at all
times pertinent to this litigation, the life-of-the- plant gas sales contracts
for the sale of the casinghead gas at the wellhead
have remained in place, and that the lessees have paid royalties to the lessors based on the proceeds received by the lessees for
the casinghead gas in accordance with the terms of
the contracts.  Nevertheless, the royalty
owners contend, and the jury found, that the lessees failed to pay royalties in
accordance with the leases.

The royalty owners expert Charles
Graham testified to his opinion that the amount OPL truly realizes for the casinghead gas is not the proceeds it receives under the
wellhead gas sales contracts.[11]
His opinion focused on the circumstance that OPL, through its acquisition of
sole ownership of both the leases and the Slaughter Plant, is both seller and
buyer of the casinghead gas.  It follows, according to Graham,
that the determination of the amount realized by OPL is no longer
limited to that received under the gas sales contracts.  His opinion was that the amount OPL realizes
for the gas at the wellhead, properly calculated, equals 100% of the proceeds
of the downstream sales of the extracted NGLs and residue gas less certain
costs.[12]  One eighth of that amount, Graham testified,
is the royalty owed by OPL.  

We find Grahams testimony provided no evidence OPL failed to pay
royalties as required by the leases. 
First, his theory simply does not comport with the plain language of the
leases.  Under the four amount-realized
leases, royalty is calculated on the amount realized from sale only if the gas
is sold at the well; otherwise, royalty is payable on the market value of the
gas.  The gas royalty language from the
1934 Christine DeVitt B lease is typical of the
four amount-realized leases, stating that the royalty is on gas produced from
said land and sold or used off the land or in the manufacture of gasoline,
including casinghead gas, the market price at the
well of one-eighth of the gas so sold or used, provided that if and when lessee
shall sell gas at the wells lessors royalty thereon
shall be one-eighth of the amount realized from such sales.  There is no dispute that the such sales
referred to are the sales of gas at the wells. 
Grahams theory necessarily makes use of the gas sales contracts to
establish that the casinghead gas is sold at the wellhead
(thus triggering the obligation to pay royalty on the amount realized from
such sales), then ignores the provisions of the contracts[13] when determining the
amount realized from the sale.[14]  The royalty owners cannot have it both
ways.  If the gas sales contracts are
effective to establish that the lessee is selling the gas at the wells, so as
to trigger the obligation to pay royalty on the amount realized from such
sales, the terms of the same contracts cannot be disregarded in the
determination of the amount realized from such sales. 

Moreover, the proceeds to which
Graham pointed as the basis for his theory were not proceeds of the sale of gas
as produced at the wellhead, but those of the sale of natural gas liquids and
residue gas after processing.  Graham
testified that the amount OPL realized from the wellhead sale equaled the
proceeds of OEMIs sale of the NGLs at Mont Belvieu
and its sale of the residue gas at Waha, less
transportation and fractionation costs. 
Grahams version of the amount realized thus includes amounts OPL
realized from its activities beyond the wellhead, including its gathering of
the gas, its processing of the gas at the Mallet and
Slaughter Plants and its marketing of the extracted liquids.  Cf. Tana Oil & Gas Corp., 188 S.W.3d at 360-61 (phrase
at the well means before value is added by preparing the gas for
market).  Evidence of proceeds received
by OEMI, an affiliated but different company, from sales of NGLs and residue
gas at locations far removed from the wellhead is not evidence of the amount
realized by OPL from a sale of raw gas at the well.[15]

We agree with OPL the undisputed evidence that royalties have been paid
in accordance with the proceeds received under the casinghead
gas sales contracts is conclusive evidence that royalties have been paid as
required by the leases.  See Keller, 168 S.W.3d at
814-15 (discussing conclusive evidence). 


The Implied Duty to Market Gas

            BP
and OPL next challenge the legal sufficiency of evidence supporting the jurys
findings of liability and damages for failure to reasonably market gas produced
under the amount-realized leases.  

If silent on the subject, an oil and
gas lease includes an implied covenant by the lessee to manage and administer
the lease.  Yzaguirre, 53 S.W.3d at 373.  This implied covenant places on the lessee
the duty to market the oil and gas reasonably. 
Id.; Amoco Prod. Co. v. Alexander, 622 S.W.2d 563, 568 (Tex. 1981) (conduct of
lessee is measured by that of reasonably prudent operator under same or similar
circumstances).  The focus in an action
for breach of the duty to reasonably market is on the conduct of the lessee and
not other sales.  Union Pac. Res. Group, Inc. v. Hankins,
111 S.W.3d 69, 71 (Tex. 2003). 

We begin our discussion by noting our
disagreement with one position taken by OPL. 
It argues that the Texas Supreme Court has limited breaches of the
implied covenant to market to instances in which the proceeds received by the
lessee were the result of fraud or sham. 
OPL relies on language in Hankins,
111 S.W.3d at 74, for this proposition. 
We do not agree that Hankins
so held.  As the court pointed out in Bowden, 247 S.W.3d at 700, the issue
with which the court dealt in Hankins
was whether there was a common legal question within a class consisting of lessors of market-value and proceeds leases.  The court began its analysis of that issue in
Hankins by listing the common issues
the trial court had identified.  111 S.W.3d at 73. 
Searching the list for at least one issue of law or fact that both
inhered in the complaints of all proposed class members and was subject to
generalized proof, the court divided the trial courts list into a group of
issues it found questioned whether the defendants breached the implied covenant
by failing to obtain arms length prices and a group it characterized as
questioning whether a defendant had engaged in a sham transaction with an
affiliated company.  Id. at 74.  Reiterating the holding of Yzaguirre that no
covenant to reasonably market is implied in market-value royalty leases, and
finding that market-value royalty owners are protected from the effects of
inter-affiliate transactions by their entitlement to receive royalty based on
the objective market value, the court went on to hold that none of the trial
courts listed issues had application to market-value leases, depriving the
proposed class of commonality.  Id. at 74-75.  The statement to which OPL points, the question under a proceeds lease would be whether the
proceeds actually received by the lessee were a fraud or a sham, id. at 74, must
be seen in its context of the courts discussion of the issues identified by
the trial court in that case.  We do not
believe the Supreme Court intended by the statement to limit the duty to
reasonably market, when implied, to a duty in all cases simply to avoid
fraudulent or sham marketing transactions. 
Nor do we see anything in the courts opinion in Bowden, which OPL also cites, to suggest such a limitation
applicable in all cases.  247 S.W.3d at 700 (noting that Hankins
did involve similar allegations that the lessees intra-affiliate sales
transactions were a sham).

We agree, though, with OPL that in an
evaluation of the sufficiency of the evidence it breached its duty to
reasonably market the casinghead gas, our inquiry
must focus on its behavior, not on evidence of other sales.  Hankins,
111 S.W.3d at 71. 
And we agree that the evidence of its breach of the duty is legally
insufficient.        

            The
charge asked whether BP and OPL failed to reasonably market gas produced from
the proceeds leases.  In conjunction with
the question, the trial court instructed the jury that BP and OPL had a duty
to act as a reasonably prudent operator would act under the same or similar
circumstances.  

            The
royalty owners argue the evidence showed that selling the casinghead
gas for such meager proceeds, that is, a third of the liquids and half the
residue gas, breaches the duty to market because [a reasonably prudent
operator] would not sell gas to a plant on such low proceeds  particularly
when the [reasonably prudent operator] owns and controls the plant.  But, as noted, it is undisputed that OPL has
paid royalties according to the proceeds under the percentage gas sales
contracts put in place by its predecessors. 
Moreover, no witness opined that the percentage sales contracts were
unreasonable when signed.  Graham
testified that the lessees entry into the percentage sales contracts when the
Slaughter Plant was built was reasonably prudent.  It is undisputed also that the terms of those
contracts extended for the life of the plant. 
The allegedly breaching behavior of OPL, then, does not consist of any
action on its part but merely its failure to change the terms of contracts that
came with the properties it purchased.

            The
royalty owners emphasize the self-dealing nature of the gas sales contracts,
referring to the contracts as OPLs left hand selling the gas to its right
hand.  As a pattern for their implied
covenant analysis, the royalty owners point to Harding v. Cameron, 220 F. Supp. 466 (W.D. Okla. 1963), a diversity
case applying Oklahoma law.  Id. at 467.  The royalty owners correctly note that Harding involved a lessee who occupied
both the selling and buying sides of an arrangement for the compression of natural
gas.  On a complaint by his lessors of underpaid royalties, the court held the lessee
had breached duties to exercise the diligence of a prudent operator and to
obtain a market for the gas at the best price obtainable.  Id. at 470.  Citing
his self-dealing, the court found that the lessee had acted primarily in his
own interest and without regard to his obligations to the lessors.  Id.  

            We
do not find Harding persuasive
authority on the issues involved here. 
First, under Oklahoma law, royalty was payable on the value or market
price of the gas, and Texas does not recognize an implied duty to market under
a lease with a market-value royalty provision. Hankins, 111 S.W.3d at 72; Yzaguirre, 53
S.W.3d at 374.[16]  Second, the actions of the lessee in Harding involved setting up the
offending gas marketing arrangements, not simply acquiring both sides of
arrangements that were prudent when established.[17]

            Certainly
Texas implied covenant law takes self-dealing into account.  The Texas Supreme Court has noted that the
implied covenant to reasonably market oil and gas serves to protect a lessor from the lessees self-dealing or negligence.  Yzaguirre, 53 S.W.3d at 374.  But the royalty owners here seem to assume
that a showing of self-dealing is all that is required to show a breach of the
implied covenant.  In fact, their
evidence of OPLs breach of the duty to reasonably market the casinghead gas is dependent on its self-dealing.  Under the royalty owners theory, OPL has
breached its duty to reasonably market by failing to modify the terms of the
gas sales contracts precisely because it, acting alone, has the ability to do
so.  The royalty owners presented no
evidence that a reasonably prudent seller of casinghead
gas in OPLs position would have any ability to terminate or modify the
life-of-the-plant gas sales contracts if it were not also the plant owner, nor
did they present any evidence that the terms of a re-negotiated or modified gas
sales contract for gas in the Slaughter Field, negotiated at arms-length, would be better for the seller than those of
the existing contracts.[18]  While the royalty owners produced substantial
blocks of expert testimony and documentary exhibits supporting their claims, we
agree with OPL there was no proof of what different marketing action was
required of a reasonably prudent operator under the same or similar
circumstances.  See Migl v. Dominion Oklahoma Texas Expl. & Prod., Inc., 2007 Tex. App. Lexis 1179, at *18-*19 (Tex.App.--Corpus Christi 2007, no pet.) (mem. op.) (considering
evidence of breach of implied covenant to reasonably market).

            Underpayment
of Royalties on Market-Value Leases

By their third cause of action, the
royalty owners claimed BP and OPL failed to pay royalties based on the market
value of gas in the field under the market-value leases.  As noted, the royalty clauses of these leases
provide a three-eighths royalty of the market value in the field of gas
sold.  The jury gave a positive answer to
the question asking whether OPL failed to pay royalty based on market value. 

The royalty owners relied at trial on
the testimony of their market value expert, Christopher Kay Alguire.  BP and OPL objected in the trial court and
argue here that Alguires testimony was irrelevant
and unreliable, and therefore provided no evidence.  Of the positions they advance supporting
their argument,[19]
we address two:  that Alguires
definition of market value does not comport with Texas law, and that the gas
sold under the contracts on which she formed her market value opinion was not
comparable in quality to the gas produced on the OPL leases at issue in this
litigation.  

            The
market value of property is the price it would bring when offered for sale by
one desiring, but not obligated, to sell and bought by one under no necessity of
buying it. Yzaguirre, 53 S.W.3d at 374 (citing Middleton, 613 S.W.2d at 246).  Texas law recognizes two methods to determine
market value of gas sold at the well.  Heritage Res., Inc. v. Nationsbank, 939 S.W.2d 118, 122 (Tex. 1996).  The preferred method, and that used by the
royalty owners expert Alguire, is that of examining
comparable sales.  See id. at 122; Texas Oil
& Gas Corp. v. Vela, 429 S.W.2d 866, 872 (Tex. 1968).  To determine its market value, gas is valued
as though it is free and available for sale. 
Middleton, 613
S.W.2d at 246.  

Market value is generally determined
by comparing the sale price to other sales comparable in time, quality,
quantity, and availability of marketing outlets. Hankins, 111 S.W.3d at 71 (quoting Heritage Res., 939 S.W.2d at 122). 
A sale of gas of comparable quality involves gas with similar physical
properties such as sweet, sour, or casinghead
gas.  Middleton,
613 S.W.2d at 246. 
Proper expert testimony may make adjustments between sales of gas with
differing physical properties so that the sales being
compared truly are comparable.  See id. at 247
(referring to adjustments for gas of differing BTU content). 

One
presenting expert testimony must be properly qualified and her
opinions must be relevant and based on a reliable foundation.  See Tex. R. Evid.
702; Gammill v. Jack Williams Chevrolet,
Inc., 972 S.W.2d 713, 720 (Tex. 1998) (citing E.I. du Pont de Nemours & Co. v. Robinson, 923
S.W.2d 549, 556 (Tex. 1995)).  In
determining whether an experts testimony constitutes some evidence, an
experts bare opinion will not suffice rather the substance of the testimony
must be considered.  Merrell Dow Pharms.,
Inc. v. Havner, 953 S.W.2d 706, 711 (Tex.
1997).  The expert must explain the basis
of her statements to link her conclusions to the facts.  Earle v. Ratliff, 998
S.W.2d 882, 890 (Tex. 1999).  [A]
claim will not stand or fall on the mere ipse dixit of a credentialed
witness.  Burrow v.
Arce, 997 S.W.2d 229, 235 (Tex. 1999).  

It is the burden of the proponent of
scientific or technical evidence to demonstrate the opinions of its expert are
reliable.  See Kerr-McGee Corp. v. Helton, 133
S.W.3d 245, 254 (Tex. 2004). 
Determining reliability of the experts opinions focuses on the principles,
research and methodology underlying the conclusions of the expert.  Exxon Pipeline Co. v. Zwahr, 88 S.W.3d
623, 629 (Tex. 2002).  [E]xpert testimony is unreliable if it is not grounded in the
methods and procedures of science and is no more than subjective belief or
unsupported speculation.  Kerr-McGee, 133 S.W.3d at
254 (internal quotation marks and citation omitted).  Expert testimony is also unreliable if there
is too great an analytical gap between the data and the opinion
proffered.  Id. (quoting Gammill v. Jack Williams Chevrolet, Inc.,
972 S.W.2d 713, 726, (Tex. 1998)). 
If the experts testimony is not reliable, it is not evidence.  Kerr-McGee, 133 S.W.3d at 254 (citing Havner, 953 S.W.2d at 713).  

Unlike the market-value studies
reflected in other reported Texas cases, the market-value study to which Alguire testified was not conducted by comparing the
dollars-per-Mcf or dollars-per-MMBTU values of the
prices on which the royalty owners received royalty with royalties paid for
comparable gas. See,
e.g., Middleton, 613 S.W.2d at 247-48; Amoco
Prod. Co. v.
First Baptist Church, 579 S.W.2d 280, 282 (Tex.App.El
Paso 1979), writ refd
n.r.e., 611 S.W.2d 610 (1980) (per curiam).  Like their
claims under the amount-realized leases, the royalty owners case under the
market-value leases complained of the percentages of the post-processing sales
prices allocated to the wellhead sale, not the product sales prices
themselves.  Their contention is not that
OPL paid royalties based on below-market prices for casinghead
gas but that the allocation of only 33.3% of the NGL revenue and 50% of the
residue gas revenue to the wellhead under the percentage of proceeds contracts
resulted in royalties being paid on something less than the market value of the
casinghead gas at the wellhead.  Accordingly, Alguire
testified she compared the 33.3% of NGLs, 50% of residue gas percentage of
proceeds terms in place here with percentages of proceeds being paid under
other contracts for casinghead gas gathered to a gas
processing plant.  As Alguire
described it, her assignment from the royalty owners was to provide, annually,
percentage of proceeds that were representative of market value for the casinghead gas in the area. 

The results of Alguires
study were described in the royalty owners exhibit 296, which consisted of
charts on which were plotted the percentages of the downstream resale prices
for NGLs and residue gas received by the sellers under various contracts Alguire had reviewed. 
By plotting the contracts according to their date of signing, Alguire calculated a market value for percentages of
proceeds for each year during the period 1990 through 2007.  As an example, the chart for 1990 shows six
contracts signed during that year for the sale of casinghead
gas to a processing plant operator on a percentage of proceeds basis.  Under one
contract, the seller received for its casinghead gas
50% of the proceeds of the downstream sale of NGLs and 75% of the proceeds of
the sale of residue gas.  Other
percentages reflected on the 1990 chart ranged from 35% to 75% of NGL
proceeds.  Based on those results, Alguire determined that the market value for such
proceeds in 1990 was 60% of NGL proceeds. 
By her determinations, the market value proceeds ranged from 60% in
the earlier years of her study to 80% in the years 2001 through 2007.  Her conclusion was that the 33 percent basis
for the percentage of proceeds [under the OPL contracts] was below the range
observed for comparable casinghead gas sales in the
area.

As OPL points out, Alguires study never resolves itself to a market value for
the casinghead gas stated in dollars and cents.  The studys premise is that there is a
market value for percentages of proceeds. 
We agree with OPL that Alguires study and
testimony provide no evidence OPL failed to pay royalties based on the market
value of the gas in the field.

The royalty owners argue that the
downstream prices OPL receives for its processed residue gas and extracted NGLs
were not at issue in the litigation and their amounts and sufficiency were not
in dispute.  The royalty owners insist
that the only dispute with regard to the market-value leases was whether the 33.3%
NGLs, 50% residue gas proceeds allocated to the wellhead by OPL constitute
market value in the field.  We recognize
it is common for casinghead gas to be sold on
percentage of proceeds terms,[20]
and recognize the changes in recent decades in the marketing of natural gas and
NGLs. Nonetheless, it seems to us that comparing percentages begs the question
percentage of what?  Without evidence
of the downstream prices for which other gas plant operators sold their NGLs
and residue gas, it seems to us impossible to reach a true market value
conclusion.  Evidence that a seller of
gas received 50% of NGL proceeds is meaningless without knowledge of the amount
of the proceeds.

OPL also contends Alguires
testimony was unreliable, and thus provided no evidence, because the casinghead gas sold under other contracts she compared was
not comparable in quality to that produced from the two Slaughter Field
market-value leases.  We agree with this
contention as well.  

One of the two market-value leases is
a part of the Slaughter Estate Unit, the other a part of the Northwest Mallet
Unit.  For the period the royalty owners
claimed damages, the Slaughter Estate Unit was under CO2
injection.  A 2001 revenue audit report
prepared by Alguire described the natural gas
production as extremely contaminated, mostly by carbon dioxide.  The report stated carbon dioxide levels
exceeded 80% of metered production on the Slaughter Estate Unit and roughly
40% on the Northwest Mallet Unit.  Alguires trial testimony was consistent with her 2001
report.  She said gas produced from the
Slaughter Estate Unit during the period contained CO2 levels in the
80-90% range.  The Northwest Mallet Unit
was not under CO2 injection until the conclusion of Alguires survey period. 
But carbon dioxide in the gas produced from this unit increased from the
20-30% range in the mid-1990s to the 60-70% range by 2007.  Before injection began on the Northwest
Mallet Unit, CO2 migrated there from surrounding properties.

Alguire acknowledged that the comparable
sales approach for obtaining market value requires consideration of the quality
of the gas.  But Alguire
conducted her market value study on the premise that high levels of injected CO2
should not be included as a comparability factor in the market value
analysis.  She explained the rationale
for her methodology:

I was hesitant about including injected CO2 in the
comparability standards because it would be effectively charging the cost of
the CO2 operations, either directly with the CO2 removal
fees, which havent been charged, or indirectly by saying this gas isnt worth
anything because it has got all of this CO2 in it that we put there,
even though, in this instance, in the Northwest Mallet Unit, it wasnt even put
there by the operators.  It seeped in
from surrounding areas.

            Alguires intentional[21]
omission of the high CO2 content of the gas from her comparability
evaluation[22]
improperly injects an entirely subjective factor into the search for what Texas
law describes as an objective calculation. 
See Bowden, 247 S.W.3d at 709 ([m]arket value leases provide an objective basis for
calculating royalties . . . .); Yzaguirre, 53 S.W. at 374; Hankins, 111 S.W.3d at 72 (both also referring to objective basis
for calculating royalties provided by market-value royalty provisions).  It represents, moreover, the kind of
outcome-directed methodology condemned in Robinson.
923 S.W.2d at 559. 

Alguire presented lengthy and detailed
testimony.  But by not considering
contracts for sale of gas with high CO2 content in her evaluation of
the market value of the Slaughter Estate and Northwest Mallet unit gas highly
contaminated with CO2, Alguire omitted a
material step in the quality analysis required by the comparable sales
approach.  Without a true comparison of
hydrocarbon quality, too great an analytical gap stands between the data,
assuming its accuracy, and Alguires market value
opinion.  See General Electric Co. v. Joiner, 522 U.S. 136, 146, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997) (opinion evidence
connected to existing data by nothing but credentialed experts ipse dixit is insufficient).  Lacking reliability, the opinion is
incompetent and amounts to no evidence that BP and OPL underpaid royalties on
the market-value leases.  In the absence
of any additional evidence supporting the jurys implicit finding of comparable
quality, we conclude its market-value finding is not supported by any evidence.

Damages

Finding the jurys affirmative
responses to the three questions inquiring of the liability of BP and OPL were
supported by legally insufficient evidence, we turn to the jurys corresponding
damage findings.  It is well established
in Texas that no recovery is allowed unless liability has been
established.  Mitchell v. Bank of Am., N.A., 156
S.W.3d 622, 627 (Tex.App.--Dallas 2004, pet. denied).  In the absence of liability findings, damage
findings are immaterial.  Fire Ins. Exch. v. Sullivan, 192 S.W.3d 99, 107 (Tex.App.--Houston [14th Dist.] 2006, pet. denied). 
We therefore sustain OPLs first issue concerning the proceeds leases, its
sub-issue concerning the implied duty to market, and its second issue
concerning the market-value leases.  

The Royalty Owners Cross-Appeal

            By
their second issue on cross-appeal, the royalty owners contend the trial court
erred in rendering judgment notwithstanding the verdict in favor of BP on its
limitations defense.  They argue the
discovery rule tolls the applicable limitation period until each royalty owner
knew or reasonably should have known facts giving rise to a cause of
action.  Because no evidence supports the
three affirmative theories of relief the royalty owners asserted against BP,
determining whether their claims were subject to a limitations defense or they
could legally assert the discovery doctrine in avoidance of limitations are
questions whose resolution is unnecessary to our disposition of this
appeal.  We, therefore, do not address the
issue.  See Tex. R. App. P. 47.1.  

            The
royalty owners third issue on cross-appeal presents the contention the trial
court erred in rendering judgment notwithstanding the verdict in favor of BP
and OPL on the royalty owners claim for attorneys fees, recovery of which
they sought under Chapter 38 of the Civil Practice & Remedies Code.  Tex. Civ. Prac. & Rem. Code Ann. §§
38.001-38.006 (West 2008).  

To recover attorneys fees under §
38.01, a party must prevail on a cause of action authorizing recovery of
attorneys fees, and recover damages.  Green Intl, Inc. v. Solis,
951 S.W.2d 384, 390 (Tex. 1997); Brent v.
Field, 275 S.W.3d 611, 621-22 (Tex.App.--Amarillo
2009, no pet.).  Because we have
concluded the royalty owners cannot prevail on a cause of action allowing
recovery of attorneys fees they are not entitled to recover attorneys
fees.  For this reason, we overrule their
third issue on cross-appeal. 

The Cross-Motions for Partial Summary
Judgment

            By
their first issue on cross-appeal, the royalty owners assert the trial court
erred by denying their motion for partial summary judgment.  The royalty owners and OPL filed
cross-motions for partial summary judgment, each seeking a judgment declaring
the character and ownership of CO2 that OPL injects into eight
leases included in three units.  Said
simply, the royalty owners contended the CO2 was subject to a
royalty; OPL argued it was not.  The
trial court agreed with OPL and rendered partial summary judgment in its
favor.     

The movant
for summary judgment has the burden of showing there is no genuine issue of
material fact and it is entitled to summary judgment as a matter of law. Tex. R. Civ. P. 166a(c). 
Reviewing a summary judgment, we take evidence favorable to the nonmovant as true, and indulge every inference and resolve
every doubt in the nonmovant's favor.  Nixon v. Mr. Property Management Co., 690 S.W.2d 546, 548-49 (Tex.
1985).  A defendant who
conclusively negates at least one essential element of a cause of action is entitled
to summary judgment on that claim.  IHS Cedars Treatment Ctr. of Desoto, Tex.,
Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004) (citing Sw. Elec. Power Co. v. Grant, 73 S.W.3d 211, 215 (Tex.
2002)).  A plaintiff moving for summary
judgment on its own cause of action must conclusively prove each element of the
cause of action.  MMP, Ltd. v. Jones, 710 S.W.2d 59, 60
(Tex. 1986) (per curiam).

When parties file cross motions for
summary judgment, and one motion is granted and the other denied, the appellate
court reviews the summary judgment evidence presented by both sides and
determines all questions presented.  Commrs Court of Titus County v. Agan, 940 S.W.2d 77, 81 (Tex. 1997).  If the issue raised is based on undisputed
and unambiguous facts, then the reviewing court may determine the question
presented as a matter of law.  Gramercy Ins. Co. v. MRD Invs., Inc., 47 S.W.3d 721, 724 (Tex.App.--Houston
[14th Dist.] 2001, pet. denied).  

According to the summary judgment
record, the CO2 OPL injects into the hydrocarbon-producing formation
to enhance oil recovery is transported to the Slaughter Field from New Mexico
and Colorado.[23]  The CO2 is extracted from the
produced gas stream at the processing plants, returned to the leases, and reinjected as part of the recovery operation.  While the royalty owners agree that the
transported CO2 is OPLs personal property before its injection,
they theorize that the extraneous CO2 loses its personal property
character on injection, is susceptible to capture in the producing formation,
and OPL is authorized to capture, or recapture, the CO2 through the
grant of the leases and provisions of the unit agreements.  As captured, they contend, the CO2
is subject to OPLs royalty obligation.[24]          

The royalty owners claims to a
royalty on the injected CO2 depend entirely on the correctness of
their contention that OPL loses title to its personal-property CO2
when it introduces the substance into the subsurface producing formation.  Although the unit agreements, to which the
royalty owners are parties, contain express authorization for the unit operator
to inject substances into the unitized formation,[25]
and the unit agreements contain provisions concerning royalty payments, we do
not understand the royalty owners to contend that the unit agreements contain a
commitment by OPL to pay royalty beyond its royalty obligation under the
leases.  Before the trial court, the
royalty owners asserted that the provisions of the unit agreements affecting
royalties did not supersede the leases royalty clauses, but simply constituted
an overlay addressing the manner in which royalty would be paid under unit
operations.[26]  Thus we consider it undisputed that the unit
agreements do not require payment of a royalty not already required under the
leases.  Similarly, the royalty owners
make no contention here that the terms of any of the leases entitle them to
royalty on the injected CO2 whether or not it became subject to the
rule of capture on its injection.  Our
inquiry, then, is whether, under Texas law, the rule of capture operates to
subject extraneous CO2 injected and recovered by OPL to a royalty
obligation under its leases.   

The rule of capture is a well established doctrine in Texas which holds
that a landowner is entitled to produce the oil and gas in place beneath his
land, as well as the oil and gas which flows to the land as the result of
physical conditions and natural laws relating to the migratory nature of oil
and gas.  Recognizing that oil and gas
are fugitive minerals that will migrate throughout a reservoir without regard
to property lines, the rule of capture provides that a landowner owns all the
oil and gas produced by a legally drilled well located on his land, even though
the well may be draining minerals from nearby properties.  

SWEPI, L.P. v. Camden Resources, Inc., 139 S.W.3d 332, 341 (Tex.App.--San
Antonio 2004, pet. denied) (citations omitted).    

            While
no Texas case directly addresses title and ownership of extraneous CO2
injected into a formation for production enhancement, the ownership of
extraneous natural gas injected into a storage formation was at issue in Humble Oil & Refining Co. v. West.  508 S.W.2d 812 (Tex. 1974).  OPL urges that our analysis of the claims to
royalty on the injected CO2 here should begin and end with Humble Oil, and a case on which it
relied, Lone Star Gas Co. v. Murchison.  353 S.W.2d 870 (Tex.Civ.App.--Dallas 1962, writ refd
n.r.e.).

In Humble Oil, deeds by the Wests to Humble in part recited that the Wests
except from this conveyance and retain unto themselves. . . . those certain royalties on oil, gas and other minerals which
may be produced and saved from the lands hereby conveyed.  Concerning gas, the conveyances described the
retained royalty as a royalty equal to the market value at the well of
one-sixth (1/6) of the dry gas so sold or used; provided that on such dry gas
sold at the wells the royalties shall be one-sixth (1/6) of the amount realized
from such sale.  Id. at 813.  

As the field
reservoir approached depletion, Humble obtained Railroad Commission
authorization to use the reservoir for gas storage.  Id.  The Wests sued
Humble for injunctive and declaratory relief. 
The trial court ordered Humble to account to the Wests
for their royalty interests in all gas produced irrespective of whether the gas
was extraneous or native.  Id. at 814.  The court of civil appeals reversed with
instructions for entry of a permanent injunction restraining Humble from
injecting and storing gas in the reservoir until all native gas was
produced.  Id.  

Before the supreme court, the Wests argued because of their royalty on all oil, gas and
minerals produced and saved from the properties, Humble owed a royalty on all
gas produced and saved, whether native or extraneous.  Id. at 817.  According
to the Wests, a contrary holding would rewrite the
conveyance documents.  Id. 


            In
its analysis, the court looked to Murchison,
353 S.W.2d 870.  There, Murchison
argued Lone Star lost title to extraneous gas it injected into a storage
reservoir as the gas became like a wild animal, subject to capture.  Rejecting the notion that the gas returned to
its natural and wild state and was thus subject to the law of capture, the
court in Murchison found the correct
rule was once [severed] from the realty, gas and oil, like other minerals,
become personal property . . . title to natural gas once having been reduced to
possession is not lost by the injection of such gas into a natural reservoir
for storage purposes.  Humble Oil, 508 S.W.2d at
817 (quoting Murchison, 353 S.W.2d at
878 quoting White v. New York State Natural Gas Corp., et al.,
190 F.Supp. 342, 347, 349 (W.D. Pa. 1960)) (additional quotation marks
omitted).[27]  Relying on Murchison, the Court in Humble
Oil concluded the extraneous gas Humble injected into the storage reservoir
was and remained the personal property of Humble.

            The
Wests argued that the obligation of Humble in the conveyance
document to pay a royalty on all gas produced and saved distinguished Murchison.  508 S.W.2d at 817.  Disagreeing, the supreme
court found to adopt such reasoning would implicitly recognize the
doctrine of minerals ferae
naturae that Murchison
rejected.  Id.  Thus the court held, Humbles ownership of the gas as personal property is not
altered either upon injection of the gas in the reservoir or upon later
production of the gas.  The language of
the conveyance does no more than reserve the royalty interest in the native gas
in the reservoir, and Humbles ownership of the
extraneous gas is unaffected thereby.  Id.

            The
analogy between stored natural gas and the injected CO2 described in
this record is not exact, but we find Humble
Oil and Murchison sufficiently
analogous to guide our decision.[28]  This record does not describe differences in
the injection of extraneous CO2 to enhance oil production and the
injection of natural gas for storage to require application of a different rule
to the dispute before us.[29]  Both involve injection of a gaseous substance
into a well-defined underground formation with Railroad Commission approval.[30]
Nothing suggests OPL has an intent to abandon the CO2
it injects and recovers. See
Murchison, 353 S.W.2d at 870 (also finding no intent to abandon).  Indeed, OPLs recycling and reinjection of
the CO2 removed at the Mallet Plant belies any intent to abandon the
injected and recovered CO2.   


            The
royalty owners heavy reliance on Corzelius v. Harrell,
143 Tex. 509, 186 S.W.2d 961 (1945) is misplaced.  Corzelius concerns Railroad Commission orders regulating
production of natural gas from a field in which a gas recycling operation was
being conducted.  186
S.W.2d at 970.  It was cited to
the court in Murchison, which found
it dealt with the law of original capture, and not applicable to stored
extraneous gas.   353
S.W.2d at 870.  

Corzelius is not mentioned by the court in Humble Oil.  Corzelius is more
often cited in cases concerning assertions of subsurface trespass.  See, e.g., Coastal Oil & Gas v. Garza Energy Trust, 268 S.W.3d
1, 13 n.37 (Tex. 2008); Railroad
Commission of Texas v. Manziel, 361 S.W.2d 560,
568 (Tex. 1962).  Like the court
in Murchison, 353 S.W.2d at 870, we
find it inapplicable to the question before us.   

            For
these reasons, we find the trial court did not err in granting OPLs motion for
partial summary judgment and denying that of the royalty owners.

Conclusion

Because no evidence supports the
jurys findings of liability by OPL, we reverse the judgment of the trial court
and render judgment that the royalty owners take nothing against OPL.  We remand the case to the trial court for the
entry of a new judgment consistent with this opinion and law.  We otherwise affirm the judgment of the trial
court.  

 

                                                                                                James T. Campbell

                                                                                                            Justice

 











[1] John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting
by assignment.  

 





[2] The plaintiff royalty owners are: the CH Foundation; The Helen Jones
Foundation, representing its own interests and by assignment those of Dorothy
Gail Secrest Unitrust;
James C. Arnold, Trustee for Arnold 2002 Trust; Wells Fargo Bank, Trustee
and/or Agent with Power of Attorney for Frances Snyder Flood Testamentary
Trust, Anne Snyder Testamentary Trust, and Dick Snyder Testamentary Trust;
Cheryl Mattison, Executrix for Estate of Myron D. Mattison; LAGH, Ltd.; Community Bank of Raymore, Trustee
and/or Agent with Power of Attorney for William L. Abernathy Trust, Abbie J. Burton Trust, Lynn G. Fayman
Trust, Claudia Kenyon Trust, Kern E. Kenyon Trust, Milus
D. Scruggs Trust, Thomas M. Scruggs, Jr. Trust, David L. Fayman
Trust, and Faith Fayman Strong Trust; Texas Capital
Bank Trustee and/or Agent with Power of Attorney for Dora Lee Langdon Mineral
Trust, Jane Byars Roby Mineral Trust, and Dora
Langdon Article V. Trust; Frost National Bank, Trustee and/or Agent with Power
of Attorney for Johnson Oil Control (Trust Entity Incorporating Kathleen L.
Webster Trust, Joseph M. Durkin Trust, Mark L. Johnson Trust, Sheila A. Johnson
Trust, Catherine L. Johnson Tekstar Trust), Karen Hixon Trust, Dora Lee Langdon Article IV Trust, and Lee
Kendall Langdon Trusts (F/B/O Clay Langdon and F/B/O Lee Kendall Langdon); Bank
of America Trustee for J. Lee Johnson, Jr. Trust U/W F/B/O J. Lee Johnson, IV;
Mark L. Johnson, Trustee for J. Lee Johnson III Descendants Revocable Trust and
Executor for Estate of J. Lee Johnson III; KCJ Family Ltd. Partnership; Joseph
A. Durkin, Executor and Trustee for Estate of Catherine J. Durkin; Kathleen D.
Webster; Joseph M. Durkin; Teresa M. Durkin Wilkinson; Jack Wilkinson, Jr.,
Trustee for Teresa M. Durkin Wilkinson Trust; J.P. Morgan Chase, Trustee and/or
Agent with Power of Attorney for  Billie
Lucille Parker Agency, Earle North Parker Irrevocable Trust, Lynsey Alison Edens Recovable Trust, and William Ashley Edens
Recovable Trust; Pamela Allison Parker Clifton for
Ruthie Young Parker Life Estate; Clay A. Parker; Albon
Head, Jr.; Michael M. Gibson; David Chappell; Stanford Harrell; KHM Enterprises
Ltd.; Martha Price; Jeanne Van Zant Sanders (Trustee
of the Fred A. Sanders Testamentary Trust; Formerly, Est. of Frederick A.
Sanders); Albert E. Sanders; Paula Day (Executrix of Est. of Sam J. Day);
Winfred Hooper, Jr.; The Plum Foundation, representing the interests of Dorothy
Gail Secrest; Olney Wallis, Trustee for Gary Macklyn Green Grantors Trust; William Jewell College.





[3] The leases at issue describe land located in Hockley,
Terry and Cochran Counties, Texas. 

 





[4] Casinghead gas is
statutorily defined as meaning any gas or vapor indigenous to an oil stratum
and produced from the stratum with oil. 
Tex. Nat. Res. Code Ann. § 86.002(10) (West 2001).





[5] See, e.g., Yzaguirre v. KCS Resources, Inc., 53 S.W.3d 368, 372
(Tex. 2001) (distinguishing market value and amount realized or proceeds
royalty provisions).





[6] See Bowden v. Phillips Petroleum Co., 247 S.W.3d 690, 708 (Tex. 2008) (also describing
percentage of proceeds contract). 





 

[7] Gas from the six leases at issue here is sold under
one of three Casinghead Gas Contracts, two dated in
1947 and the third in 1954.  They have
been amended but the amendments are not germane to the issues in this
case.  For our purposes, the three contracts
may be considered identical.

 





[8]  According to
the testimony of an OPL employee, the Slaughter Plant can handle gas bearing a
composite carbon dioxide and hydrogen sulfide content up to 12%.

 





[9] The royalty owners filed suit in
January 2006, seeking damages for the alleged wrongful conduct of BP from 1990
to 2000.  They asserted the discovery
doctrine in avoidance of the limitations defenses interposed by BP.  OPL acquired the leases and plants in August
2000 but the royalty owners limited their claims against OPL to the period
January 2002 through August 2008.





[10] 
On liability and damage questions like those submitted against OPL, the
jury made affirmative findings against BP. While the jury made findings
supporting application of the discovery doctrine, as noted, the trial court
granted judgment notwithstanding the verdict in favor of BP on limitations
grounds.  On appeal, BP argues the trial
court correctly disregarded the findings supporting the discovery doctrines
application. BP further contends that even were this error, no evidence supported
the liability and damage findings made against BP.





[11] Graham testified that to establish the amount OPL
realized from its sale of the casinghead gas, he
looked not to the gas sales contracts but what the defendants really realized
less some costs.

 





[12] See Bowden,
247 S.W.3d at 702 (describing, in class action certification appeal, similar
distinction between wellhead prices and those received from downstream sales
after processing).  





[13] Graham straightforwardly acknowledged that his analysis ignored the
percentages stated in the gas sales contracts, opining that the contracts
percentage of proceeds formula was not binding on the lessors.  

 





[14] The royalty owners contention here is thus
distinguished from that described in Texas
Oil & Gas Corp. v. Hagen, 683 S.W.2d 24 (Tex.App.--Texarkana
1984), writ dismd
as moot, 760 S.W.2d 960 (Tex. 1988), in which the court of appeals affirmed
trial court findings that a purported wellhead sale of gas by the producer to
its wholly-owned pipeline subsidiary was a sham, and that the true sale of
the gas was off the lease premises, making a market-value royalty provision
applicable.  Id. at 28.   





[15] Note, for example, the issues recited in proposed
class litigation brought by royalty owners against affiliated defendants as
including the issue whether the corporate separateness of affiliated
defendants should be disregarded.  Union Pac. Res. Group, Inc.
v. Hankins, 111 S.W.3d 69, 73 (Tex. 2003).  Grahams opinion testimony simply assumed
that receipt of proceeds by OPLs affiliate OEMI is to be equated with their
receipt by OPL.  The royalty owners do
not support such an assumption by citation to Texas authority.  





[16] As to the substantial differences in
the approaches taken by Texas and Oklahoma courts to the lessees obligation to
pay royalty on gas production, see
John Burritt McArthur, A Minority of One? The Reasons to Reject the
Texas Supreme Courts Recent Abandonment of the Duty to Market in Market-Value
Leases, 37 Tex. Tech Law Rev. 271, 274 (2005) (Oklahoma requires the
lessee to share the price it receives in any sales contract into which it
enters in good faith); Bruce M. Kramer, Interpreting
the Royalty Obligation by Looking at the Express Language: What a Novel Idea?  35 Tex. Tech Law Rev. 223, 248-49 (2004)
(discussing Tara Petroleum Corp v. Hughey, 630 P.2d 1296 (Okla. 1981)).





[17] See Bowden,
247 S.W.3d at 698 (in similar context, the litigation of disputes over natural
gas agreements entered into in the 1940s, the court noting that despite the
passage of decades and marked changes in the ways of marketing of natural gas,
courts interpret the obligations and rights of the parties according to their
expressed intent when they entered the agreement). 





[18] The royalty owners do not contend that OPLs
predecessors acted unreasonably as operators by initiating the CO2
injection program or that OPLs maintenance of the injection program is
unreasonable.  It would seem then that
analysis of the casinghead gas marketing actions
required of a reasonably prudent operator under the same or similar
circumstances necessarily would take the consequences of that program,
including the resulting high CO2 content of the gas, into
account.   

 





[19] OPL also presents arguments that Alguires
opinions were based in part on sales too far removed geographically from those
at issue here.  We do not reach those
arguments.





[20] See,
e.g., Bowden, 247 S.W.3d at 708.





[21]  Alguires testimony makes
clear that her omission of the injected CO2 content from her
analysis was intentional.  It was a part
of the instructions she received for preparation of her study.





 

[22] Alguire candidly acknowledged on
cross-examination, for instance, that her study did not include a single
contract for gas containing CO2 in the 50% range with a percentage
of proceeds higher than the 33.3%, 50% percentages on which the royalty owners
were paid royalty.  Later in her
cross-examination testimony, Alguire made reference
to one contract in New Mexico under which gas containing 25% CO2 was
sold for 88% of proceeds.  She
acknowledged the contract would not be comparable to the higher CO2
levels in the Slaughter Estate Unit gas.

 





[23] Our discussion of this issue applies to the
extraneous CO2 transported to the field, injected by OPL into the
producing formation and recovered along with the casinghead
gas by OPL.  The royalty owners contend
the summary judgment evidence raised an issue of fact whether OPL is producing
CO2 that is native to the leased lands.  We have examined the documents on which the
royalty owners rely for the contention, which are an affidavit of their expert
Charles Graham and a memorandum of one of their attorneys.  We do not agree that either of those
documents provides evidence precluding summary judgment on their claims for
royalty on CO2.   

 





[24] As we understand their theory, the royalty owners
contend they are entitled to royalty each time the CO2 is recycled
through the producing formation. 

 





[25] The unit agreement for the Slaughter Estate Unit, for
example, gives the working interest owners the right to inject into the
unitized formation any substances in whatever amounts [they] deem expedient.

   





[26]  Unit
agreements for the Central Mallet Unit and the Slaughter Estate Unit, for
example, contain provisions limiting royalties on certain outside substances
injected into the unitized formation until other events occur.  The parties disagree on the effect of that
language but, as noted, we do not read the royalty owners briefing to contend
it would have the effect of requiring payment of royalty not required under the
leases. 





[27] Relevant to the present facts, the court in Murchison found the law of original
capture, which in general gives the owner of land the right to produce all the
oil and gas that will flow from a well on the land, inapplicable to gas that
was originally captured and subsequently restored.  Murchison,
353 S.W.2d at 880.





 

[28] And we emphasize that we deal here only with a claim for royalty by lessors on extraneous CO2 injected and recovered
by OPL. This case does not involve claims of trespass or the like, nor does it
involve claims to ownership of CO2 recovered by operators other than
OPL.  Any such case would involve
considerations not present here. 





 

[29] The royalty owners argument
that language concerning gas or gaseous substances in the leases and unit
agreements binds OPL to a royalty obligation for CO2, would seem to
underscore the similarity between CO2 and natural gas for this
purpose.  





 

[30] See, e.g.,
Tex. Nat. Res. Code Ann. §§ 91.171, et
seq. (West 2001) (underground natural gas storage); 16 Tex. Admin Code §§
3.46 (fluid injection into productive reservoirs); §§ 3.50 (enhanced oil
recovery projects).